Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED
CLERK, U.S. DISTRICT COURT

JAN - 9 2003

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

METRO-GOLDWYN-MAYER STUDIOS
INC., et al.,

        Plaintiffs,

        v.

GROKSTER, LTD., et al.,

        Defendants.

 

JERRY LEIBER, et al.,

        Plaintiffs,

        v.

CONSUMER EMPOWERMENT BV a/k/a
FASTTRACK, et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CV 01-08541-SVW (PJWx)
CV 01-09923-SVW (PJWx)

ORDER DENYING DEFENDANT SHARMAN
NETWORKS LTD.'S AND DEFENDANT
LEF INTERACTIVE'S MOTIONS TO
DISMISS

ENTER ON ICMS

JAN 1 0 2003

## I.   INTRODUCTION

    Plaintiffs bring these actions for copyright infringement under
17 U.S.C. §§ 501, et seq.  The Court has jurisdiction pursuant to 28
U.S.C. § 1331.  Defendant Sharman Networks Ltd. moves to dismiss for
lack of personal jurisdiction, lack of subject matter jurisdiction,
improper venue, and forum non conveniens.  See Fed. Rules Civ. P.

Rules 12(b)(1), (2), and (3).  Defendant LEF Interactive Pty Ltd.
moves to dismiss for lack of personal jurisdiction only.

For the reasons set forth below, both Motions are DENIED.


II.   **FACTUAL/PROCEDURAL BACKGROUND**

A.   **The Parties**

These two related cases arise from the free exchange of
copyrighted music, movies and other digital media over the Internet.
When the actions were originally filed, Defendants Grokster, Ltd.
("Grokster"), Streamcast Networks, Inc. (formerly known as
MusicCity.com, Inc.) ("Streamcast" or "MusicCity"), and Kazaa BV
(formerly known as Consumer Empowerment BV) ("Kazaa BV"), distributed
software that enabled users to exchange digital media via the same
peer-to-peer transfer network.  In the Metro-Goldwyn-Mayer. v.
Grokster case, CV-01-8541, Plaintiffs are organizations in the motion
picture and music recording industries, and bring an action against
Defendants for copyright infringement, pursuant to 17 U.S.C. §§ 501,
et seq.  In the Lieber v. Consumer Empowerment case, CV-01-9923,
Plaintiffs are professional songwriters and music publishers bringing
a class action for essentially the same claims against the same
Defendants.  The cases have been consolidated for discovery and
pretrial purposes.

When the actions were originally filed, Grokster, MusicCity and
Kazaa BV each independently branded, marketed and distributed file-
sharing software.  All three platforms were powered, however, by the
same "FastTrack" networking technology.  This technology was
developed by Defendants Niklas Zennström and Janus Friis (who also

1    launched Kazaa BV), and licensed to each company.  As a result, users

2    of all three software platforms were connected to the same peer-to-

3    peer "FastTrack network," and were able to exchange files

4    seamlessly.[1]

5        Kazaa BV, which is a Netherlands corporation, did not contest

6    jurisdiction in either case.  Rather, it answered and counterclaimed

7    for declaratory relief.  In January 2002, while related legal action

8    was pending against it in the Netherlands, Kazaa BV transferred

9    ownership of key assets to the newly-formed Sharman Networks, Ltd.

10   ("Sharman").[2]  Sharman is a company organized under the laws of the

11   island-nation of Vanuatu and doing business principally in Australia.

12   The assets transferred to Sharman include the Kazaa.com website and

13   domain, and the Kazaa Media Desktop ("KMD") software.  In its

14   agreement to acquire these assets, Sharman explicitly disclaimed

15   assumption of any of Kazaa BV's liabilities, including any liability

16   arising from these lawsuits.  (Memo of P&A in Support of Sharman's

17

18       [1]   This state of affairs has changed somewhat since the cases
were filed.  First, as discussed infra, the operation of the "Kazaa
19   system" has passed from Kazaa BV to Sharman Networks, Ltd.  Second,
the Streamcast/MusicCity Defendant no longer uses the FastTrack
20   technology.  Rather, Streamcast now employs the "open" (i.e., not
proprietary) Gnutella networking technology, and distributes its own
21   software instead of a branded version of the Kazaa Media Desktop,
which it previously used.  As a result, users of Streamcast's
22   product, Morpheus, no longer connect to the FastTrack network and do
not exchange files with Grokster or Kazaa users.  Instead, they
23   connect to the Gnutella network and are able to exchange files with
users of any number of Gnutella clients.
24

25       [2]   Sharman is owned by Australian businessperson Nicola
Hemming.  However, Kazaa BV principal Niklas Zennström apparently
26   helped bankroll Sharman by lending some up-front money used to
purchase Kazaa BV's assets.  Sharman then repaid the loan out of
27   revenue subsequently derived from these assets.  (Decl. of Ana C.
Reyes in Support of Opposition to Defendants' Motions, Hemming Dep.,
28   at 168-173.)

Motion to Dismiss for Lack of Subject Matter Jurisdiction and Other
Grounds ("Sharman Mot."), Declaration of Nicola Hemming, ¶6.)

The FastTrack software is owned by a company known as Joltid,
Ltd. ("Joltid" (formerly "Blastoise")), which is owned by Zennström.
Shortly after Sharman's acquisition of the Kazaa assets, Joltid
granted an "irrevocable, perpetual, worldwide license" to Sharman for
the use and sub-licensing of FastTrack.  (Sharman's Reply Memorandum
in Support of Motion to Dismiss ("Reply"), Declaration of Nicola
Hemming Concerning Blastoise Agreement, Exh. A, at 1.)  In return,
Joltid receives twenty percent of Sharman's revenue.  (Id.; Decl. of
Ana C. Reyes in Support of Opposition to Defendants' Motion, Hemming
Dep. at 152.)  In essence, Sharman has acquired Kazaa BV's primary
assets – the Kazaa brand, domain and website, the KMD software, and a
long-term license to the FastTrack software – without having formally
acquired the company.  Meanwhile, Kazaa BV has apparently ceased
defending this action.

B.   **The Kazaa System**

Although novel in important respects, the "Kazaa system"
operates in a manner conceptually analogous to the Napster system
described at length by the district court in A&M Records, Inc. v.
Napster, Inc., 114 F. Supp. 2d 896 (N.D. Cal. 2000).

In summary, Sharman provides free proprietary software, the
Kazaa Media Desktop, that enables Internet users to search for and
exchange digital media with other users of file-sharing software
powered by the FastTrack technology.  Sharman also operates the

-4-

1    Kazaa.com website, which serves as a central distribution and

2    customer support hub for the KMD software.

3        The KMD software can be transferred to the user's computer, or

4    "downloaded," from servers operated by Sharman (for instance, by

5    visiting Sharman's Kazaa.com website, or third-party CNET's

6    Download.com, and choosing to download the software).  Once

7    installed, each KMD user may elect to "share" certain files located

8    on the user's computer, including, for instance, music files, video

9    files, software applications, e-books, and text files.  When launched

10   on a user's computer, KMD automatically connects to the FastTrack

11   peer-to-peer network, and makes any shared files available for

12   transfer to any other user's computer.

13       Once connected to the FastTrack network, the KMD software

14   provides a range of means through which a user may search through

15   this pool of shared files.  For instance, a user can select to search

16   only among audio files, and then enter a keyword title or artist

17   search.  Once a search commences, the KMD software displays a list

18   (or partial list) of users who are currently sharing files that match

19   the search criteria, including data such as the estimated time

20   required to transfer each file.  The user may then click on a

21   specific listing to initiate a direct transfer from the source

22   computer to the requesting user's computer.  When the transfer is

23   complete, the requesting user and source user have identical copies

24   of the file, and the requesting user may also start sharing the file

25   with others.  The KMD software includes other features, such as

26   facilities for organizing, viewing and playing media files, and for

27   communicating with other users.

28

1      Because the KMD software itself is free, most of Sharman's

2  revenue comes through its advertising partnerships.  Instead of

3  selling advertising directly, Sharman "bundles" its KMD software with

4  third-party software that operates whenever KMD is launched.  The

5  third-party software retrieves advertising from third-party servers

6  not controlled by Sharman, and then displays that advertising through

7  the KMD interface.

8

9  **III.  SHARMAN'S MOTION TO DISMISS**

10     A.   **Personal Jurisdiction**

11      For this Court to have personal jurisdiction over the

12  Defendants, the exercise of jurisdiction must be authorized under

13  California's "long-arm" jurisdictional statute and comport with

14  constitutional due process limitations.  <u>Aanestad v. Beech Aircraft</u>

15  <u>Corp.</u>, 521 F.2d 1298, 1300 (9th Cir. 1974); <u>see</u> Fed. R. Civ. P.

16  4(k)(1)(A).  Because California authorizes jurisdiction to the full

17  extent of the Constitution, the only question before the Court is

18  whether the exercise of in personam jurisdiction in this case is

19  consistent with due process.  <u>See</u> Cal. Code Civ. Proc. § 410.10

20  (2002); <u>Peterson v. Highland Music, Inc.</u>, 140 F.3d 1313, 1317 n.2

21  (9th Cir. 1998).

22      Plaintiff has the burden of establishing that jurisdiction

23  exists over the Defendants.  <u>Cubbage v. Merchant</u>, 744 F.2d 665, 667

24  (9th Cir. 1984), <u>cert. denied</u>, 470 U.S. 1005, 105 S. Ct. 1359 (1985).

25  However, the plaintiff need only make a prima facie showing of

26  jurisdiction to survive a jurisdictional challenge on a motion to

27  dismiss where, as here, a court has not heard testimony or made

28

1  findings of fact.[3]  <u>Ziegler v. Indian River County</u>, 64 F.3d 470, 473

2  (9th Cir. 1995); <u>Omeluk v. Langsten Slip & Batbyggeri A/S</u>, 52 F.3d

3  267, 268 (9th Cir. 1995); <u>Data Disc Systems, Inc. v. Systems Tech.</u>

4  <u>Assoc., Inc.</u>, 557 F.2d 1280, 1285 (9th Cir. 1977).  For purposes of a

5  motion to dismiss, factual allegations are taken as true, though it

6  is appropriate when considering jurisdictional issues to look beyond

7  the pleadings to any evidence before the Court.  <u>Cargill Intern. S.A.</u>

8  <u>v. M/T Pavel Dybenko</u>, 991 F.2d 1012, 1019 (2d Cir. 1993).

9      In the absence of a traditional basis for asserting jurisdiction

10  (i.e., physical presence, domicile or consent), due process requires

11  that a non-resident defendant have "certain minimum contacts with the

12  forum [state] such that the maintenance of the suit does not offend

13  'traditional notions of fair play and substantial justice.'"

14

15      [3]    Defendant LEF Interactive PTY, Ltd. ("LEF") argues that
because Plaintiffs have taken extensive discovery on the
16  jurisdictional issue, they should be held to a "preponderance of the
evidence" burden.  (LEF's Reply to Pls.' Opp. to Mot. to Dismiss, at
17  3.)  LEF cites one Second Circuit case and one District of Columbia
case that seem to support this proposition.  (<u>Id.</u>)
18      However, this Court is not governed by those decisions.  Rather,
the controlling authority in this circuit is that set forth in <u>Data</u>
19  <u>Disc</u> and reaffirmed in <u>Omeluk</u> and <u>Ziegler</u>.  The <u>Data Disc</u> court
established that where jurisdiction is determined by written
20  materials, such as "affidavits or affidavits plus discovery
materials," a plaintiff must make only a prima facie case of
21  jurisdiction.  557 F.2d at 1285.  Where these materials raise issues
of credibility or disputed questions of fact, the district court in
22  its discretion may order a preliminary hearing to resolve the
contested issues.  <u>Id.</u>  Only "[i]n this situation, where the
23  plaintiff is put to his full proof," is plaintiff required to
"establish the jurisdictional facts by a preponderance of the
24  evidence . . . ."  <u>Id.</u>    Plaintiffs in this case have been limited to
written submissions; the Court has not conducted a hearing or made
25  findings of fact.  Thus, Plaintiffs are obligated under <u>Data Disc</u> to
make only a prima facie showing.  Moreover, the Court notes that most
26  of the key jurisdictional facts are essentially undisputed.  As set
forth <u>infra</u>, they present a compelling case for jurisdiction over
27  both Sharman and LEF, effectively mooting the question of which
burden applies.
28

1 | _International Shoe Co. v. State of Washington_, 326 U.S. 310, 316, 66

2 | S. Ct. 154 (1945) (quoting _Milliken v. Meyer_, 311 U.S. 457, 463

3 | (1940)).  The defendant is subject to "specific jurisdiction" where

4 | the cause of action arises out of or relates to the defendant's

5 | contacts with the forum.  _Burger King Corp. v. Rudzewicz_, 471 U.S.

6 | 462, 472 & n.15, 105 S. Ct. 2174 (1985).  If the defendant's contacts

7 | are of a sufficient magnitude, it is subject to "general

8 | jurisdiction" - that is, subject to suit on any matter, including

9 | those not arising out of the in-forum activity.  _See Perkins v._

10 | _Benguet Consol. Mining Co._, 342 U.S. 437, 447-48, 72 S. Ct. 413

11 | (1952).

12 |

13 |             1.    In-Forum Activities

14 | Plaintiffs assert that Sharman engages in a wide range of

15 | contacts with this forum, which can be summarized roughly as follows:

16 |        1)    Provision of the KMD software to approximately two million

17 |              California residents and execution of end-user license

18 |              agreements between Sharman and these users;

19 |        2)    Use of California and U.S. agents, including a Los Angeles-

20 |              based public relations firm, a California company engaged

21 |              in selling and serving advertising to users of the KMD

22 |              software, and a San Francisco-based law firm;

23 |        3)    Contracts Sharman assumed from Kazaa BV, including use of

24 |              California-based CNET.com for recording the number of

25 |              copies of Defendant's software downloaded, and advertising-

26 |              related agreements with California and U.S. companies; and,

27 |

28 |

1       4)    Inclusion in certain contracts assumed from Kazaa BV of

2            California and other U.S. state choice of law and forum

3            selection clauses, including in the FastTrack licensing

4            agreement.

5  (Plaintiffs' Memorandum in Opposition to Defendants Sharman's and

6  LEF's Motions to Dismiss ("Opp.") at 4-10.)

7

8       2)   <u>General Jurisdiction</u>

9     Plaintiffs do not make a serious case for general jurisdiction,

10  instead consigning their argument on this point to a two-sentence

11  footnote.  (<u>See</u> Opp. at 12 n.8.)  Indeed, it appears that while

12  Sharman has engaged in a continuous stream of contacts with the

13  forum, they are not the types of contacts that generally approximate

14  physical presence.  They are therefore insufficient to establish

15  general jurisdiction.

16     General jurisdiction over a non-resident defendant exists where

17  the defendant's contacts are "continuous and systematic," and the

18  exercise of jurisdiction satisfies "traditional notions of fair play

19  and substantial justice." <u>Ziegler</u>, 64 F.3d at 473.  The standard for

20  establishing general jurisdiction is "fairly high," <u>Brand v. Menlove</u>

21  <u>Dodge</u>, 796 F.2d 1070, 1073 (9th Cir. 1986), and requires that

22  defendant's contacts be of the sort that "approximate physical

23  presence." <u>Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.</u>, 223 F.3d

24  1082, 1086 (9th Cir. 2000) (citing <u>Gates Lear Jet Corp v. Jensen</u>, 743

25  F.2d 1325, 1331 (9th Cir. 1984)).  The Supreme Court has upheld

26  general jurisdiction only once, in a case involving wide-ranging

27

28

1  contacts,[4] and the Ninth Circuit regularly has declined to find

2  jurisdiction even in the presence of extensive contacts.  Amoco Egypt

3  Oil Co. v. Leonis Navigation Co., 1 F.3d 848, 851 n.3 (9th Cir.

4  1993), citing Perkins, 342 U.S. 437.

5       Factors to be taken into consideration in this analysis include

6  whether the defendant is incorporated or licensed to do business in

7  the forum state, has offices, property, employees or bank accounts

8  there, pays taxes, advertises or solicits business, or makes sales in

9  the state.  See Hirsch v. Blue Cross, Blue Shield of Kansas City, 800

10  F.2d 1474, 1478 (9th Cir. 1986); Bancroft & Masters, 223 F.3d at

11  1086; Amoco Egypt Oil Co., 1 F.3d at 851 n.3.

12       As discussed infra, Sharman certainly engages in a continuous

13  stream of commercial contact with the forum state, including

14  provision of its software and execution of licensing agreements with

15  a large number of California residents.  It also engages in more

16  limited commercial contact with advertising vendors, a website for

17  counting downloads of its software, and in-state legal and public

18  relations representatives.  However, Sharman is not registered or

19  licensed to do business in California, nor does it appear to have any

20  substantial presence here (e.g., offices, employees or assets).

21  Commercial contact absent other indicia of corporate presence is

22  typically not sufficient to establish general jurisdiction.  See

23  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 104

24  S. Ct. 1868 (1984) (no general jurisdiction where Colombian

25

26       [4]     During Japanese occupation of the Philippines, a Philippine
27  company conducted most of its business affairs from the president's
    home and office in Ohio, including board meetings, correspondence,
28  banking and payment of salaries.  Perkins, 342 U.S. at 447-48.

1   corporation repeatedly purchased helicopter parts in Texas and sent

2   employees there for training, but did not have offices, agents,

3   employees or a license to do business there).  In short, it is

4   impossible based upon the contacts alleged in this case to conclude

5   that Sharman "may in fact be said already to be 'present'" in

6   California.  Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d

7   406, 413 (9th Cir. 1977).

8        Thus, general jurisdiction is not available in this case, and

9   the Court must look to whether specific jurisdiction is appropriate.

10

11             3)   Specific Jurisdiction

12        "The Due Process Clause protects an individual's liberty

13   interest in not being subject to the binding judgment of a forum with

14   which he has established no meaningful 'contacts, ties, or

15   relations.'" Burger King, 471 U.S. at 471-72 (quoting International

16   Shoe Co. v. Washington, 326 U.S. at 319).  Despite the somewhat

17   nebulous nature of this inquiry, courts typically apply rather

18   mechanical tests, which necessarily have arisen from long experience

19   in this area.  These tests are instructive, however, and not

20   necessarily definitive.  See Ochoa v. J.B. Martin & Sons Farms, 287

21   F.3d 1182, 1189 n.2 (9th Cir. 2002).  Rather, the central due process

22   inquiry remains whether an exercise of jurisdiction is "consistent

23   with traditional notions of fair play and substantial justice."

24   Quill Corp. v. North Dakota, 504 U.S. 298, 307, 112 S. Ct. 1904

25   (1992) (quoting International Shoe, 326 U.S. at 316) (internal

26   citation omitted)).

27

28

-11-

1     Under prevailing Ninth Circuit doctrine, specific jurisdiction

2 is presumptively reasonable where: 1) a nonresident defendant

3 purposefully avails itself of the privilege of conducting activities

4 in the forum state, thereby invoking the protections of its laws; and

5 2) the plaintiff's claims arise out of the defendants' forum-related

6 activities.  See Ochoa v J.B. Martin & Sons Farms, 287 F.3d at 1189 &

7 n.2; Ziegler, 64 F.3d at 473.

8

9             a)    Purposeful Availment and Relatedness

10     The purposeful availment prong requires that defendant

11 purposefully direct its activities toward the forum, or purposefully

12 avail itself of the privilege of conducting activities within the

13 forum state, thus invoking the benefits and protections of local law.

14 See, e.g., Data Disc, 557 F.2d at 1287-88 (commercial act or

15 transaction with forum); Bancroft & Masters, 223 F.3d at 1087 (effect

16 of tortious act felt in forum).

17

18             1)    Unrelated Contacts

19     Before considering whether Sharman's contacts constitute

20 "purposeful availment," it is important to note that several seem

21 immediately to fail the second prong of the specific jurisdiction

22 analysis: relatedness.

23     Contacts with a forum state are relevant for purposes of

24 specific jurisdiction only if they are sufficiently related to the

25 cause of action.  The Ninth Circuit adopts a broad, "but for" test of

26 relatedness.  See Loral Terracom v. Valley National Bank, 49 F.3d

27 555, 561 (9th Cir. 1995) (second prong of jurisdictional analysis is

28

1   met if, but for the contacts between the defendant and the forum

2   state, the cause of action would not have arisen); <u>Carnival Cruise</u>

3   <u>Lines, Inc. v. Shute</u>, 499 U.S. 585, 589, 111 S. Ct. 1522 (1991)

4   (declining to consider the Ninth Circuit's "but for" test, and

5   reversing on other grounds).  Thus, if Plaintiffs' claims would have

6   arisen notwithstanding certain contacts, those contacts are not

7   relevant to the jurisdictional analysis.  <u>See</u> <u>Ballard v. Savage</u>, 65

8   F.3d 1495, 1500 (9th Cir. 1995).

9       To justify the relatedness of many of the contacts above,

10  Plaintiffs offer variations of their rather conclusory argument that

11  all the contacts are "necessary to every single aspect of

12  [Defendants'] infringing business. . . ."  (Opp. at 18.)  In other

13  words, but for Sharman's overall corporate activities, it would not

14  be in business and would not be engaging in the alleged infringement

15  of Plaintiffs' copyrights.  Plaintiffs argue that contacts such as

16  corporate contracts, the retention of law and public relations firms,

17  and advertising-related sales, all go toward perpetuating Sharman's

18  business, and thus enabling the infringement of which Plaintiffs

19  complain.  (<u>See</u> Opp. at 14-18.)

20      It is true that the Ninth Circuit's "but for" test of

21  relatedness is broader than those adopted by certain other circuits.

22  <u>See</u> <u>Nowak v. Tak How Invs.</u>, 94 F.3d 708, 714-15 (1st Cir. 1996)

23  (comparing tests).  Nonetheless, "but for contacts" still must have

24  some degree of proximate causation to be considered for purposes of

25  jurisdiction.  <u>See, e.g.</u>, <u>Doe v. American Nat'l Red Cross</u>, 112 F.3d

26  1048, 1051-52 (9th Cir. 1997) (alleged negligence of FDA official in

27  regulating blood supply too attenuated from actual injury to be

28

1 | considered but for cause of death resulting from transfusion of

2 | tainted blood).

3 | Plaintiffs' implicit theory of relatedness would swallow the

4 | rule, at least with respect to corporate defendants.  All corporate

5 | contacts are, in some sense, intended to further corporate purposes.

6 | But no court has held that this fact dispenses with the relatedness

7 | analysis.  Rather, contacts may only be considered for purposes of

8 | the jurisdictional analysis if they are sufficiently related to the

9 | underlying causes of action.  See Bancroft & Masters, 223 F.3d at

10 | 1088 (pertinent contacts are those "that give rise to the current

11 | suit"); Marino v. Hyatt Corp., 793 F.2d 427, 430 (1st Cir. 1987)

12 | (proximate causation test); Sybaritic, Inc. v. Interport Int'l, Inc.,

13 | 957 F.2d 522, 524-25 (8th Cir. 1992) (same); Third Nat'l Bank in

14 | Nashville v. WEDGE Group, Inc., 882 F.2d 1087, 1091 (6th Cir. 1989)

15 | ("substantial connection" test); In re Oil Spill by Amoco Cadiz off

16 | Coast of France, 699 F.2d 909, 917 (7th Cir. 1983) (similar).

17 | Contacts with U.S. agents such as public relations

18 | representatives and lawyers, contacts respecting advertising

19 | relationships, and the use of a California company for counting

20 | downloads of Sharman's software, are simply not but for causes of the

21 | alleged infringement.  Further, the fact that Sharman may have

22 | executed or assumed contracts containing California forum selection

23 | or choice of law provisions is immaterial on this point with respect

24 | to contracts that are essentially unrelated to Plaintiffs' claims.

25 | (See Opp. at 9-10 n.6 & 7.)  The only contract with such provisions

26 | that is even peripherally related to these cases is a license for use

27 |

28 |

-14-

of the FastTrack peer-to-peer technology that powers the KMD software.  Such a license is simply too attenuated from the infringement itself to be considered a significant contact in the jurisdictional analysis.

Plaintiff does allege that Sharman engages in "geo-targeted" advertising, i.e., advertising that is targeted to California residents.  In at least one outlier case, advertising that gave rise to a plaintiff's claims was held to be sufficiently related to those claims.  See Nowak, 94 F.3d at 715 (Hong Kong hotel's solicitation of business in Massachusetts sufficient to justify jurisdiction in Massachusetts over claims related to Massachusetts resident's drowning death in hotel's pool).  Here, however, the advertising seen by users is served by third-party companies, which pay Sharman to bundle their advertising software with Sharman's KMD.  Thus, any targeting of forum residents is done by other companies and not by Sharman.  More significantly, there is no evidence that this advertising gave rise to Plaintiffs' claims, i.e., that the advertising itself is a relevant contact for purposes of jurisdiction over the copyright claims.


                    2)    Related Contacts

In contrast, Sharman's distribution of the KMD software, and licensing of its use, are "but for" causes of the alleged infringement.  But for Sharman's acts in these regards, Plaintiffs'

1  claims of direct infringement never would have arisen against

2  Sharman.[5]

3       Defendant's chief argument against purposeful availment is that

4  its "internet activities" are "passive in nature," and that, while

5  the KMD software can be downloaded by anyone in the world, Sharman

6  "does not purposefully direct anything toward California." (Mot. at

7  18.)  Rather, Sharman asserts that it "does not know the identity" of

8  persons downloading its software nor does it know where they reside.

9  (Reply at 12.)  In short, Sharman contends, the KMD software is made

10  freely available worldwide, and the only distribution contacts with

11  California are those initiated by California residents.

12       Indeed, the Supreme Court has held that personal jurisdiction

13  cannot be exercised constitutionally where the only contact with the

14  forum state is the result of an isolated or fortuitous act not

15  directed by the defendant.  See <u>World-Wide Volkswagen Corp. v.</u>

16  <u>Woodson</u>, 444 U.S. 286, 100 S. Ct. 559 (1980) (no Oklahoma

17  jurisdiction over New York automobile dealer in products liability

18  action where the only contact with the forum was the sale of the car

19  to New York residents who subsequently drove the vehicle to Oklahoma

20  and suffered injuries there); <u>Kulko v. Superior Court</u>, 436 U.S. 84,

21  98 S. Ct. 1690 (1978) (consent by father, who is a New York resident,

22  to allow children to live with mother who had relocated to California

23

24          [5]    Technically, Sharman's distribution of its software to
California residents is a but for cause of only a portion of the
25  injuries alleged: those resulting from use of the software by
California residents.  To the extent that this distinction would
26  deprive California state courts of jurisdiction over certain aspects
of these cases, this Court nonetheless may consider Sharman's other
27  U.S. contacts under Rule 4(k)(2) of the Federal Rules of Civil
Procedure.  See <u>infra</u>.
28

1   not sufficient to establish jurisdiction over father in California

2   for enforcement of child support obligations); Hanson v. Denckla, 357

3   U.S. 235, 78 S. Ct. 1228 (1958) (no jurisdiction in Florida over

4   Delaware corporate trustee where trust was executed in Delaware and

5   plaintiff then relocated to Florida).

6         Consequently, this Court previously has recognized that the

7   operation of a "strictly 'passive' website, in which the only

8   contacts with the forum state consist[] of mere viewings of the

9   website's content by those surfing the internet," typically will not

10  give rise to specific jurisdiction.  Batzel v. Smith, 2001 U.S. Dist.

11  LEXIS 8929, at *7 (C.D. Cal. June 6, 2001).  On the other hand,

12  jurisdiction may be appropriate where the Internet conduct includes

13  "something more" to show the plaintiff directed substantial activity

14  toward the forum.  Cybersell, Inc. v. Cybersell, Inc., 130 F.3d 414,

15  418 (9th Cir. 1997).  These poles reflect a familiar spectrum,

16  wherein jurisdiction is more likely the greater the "'level of

17  interactivity and commercial nature of the exchange of information

18  that occurs'" with the forum state.  Id. at 418 (quoting Zippo Mfg.

19  Co. v. Zippo Dot Com, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)).

20        In this analysis, the Court considers the scope and nature of

21  the related contacts. Factors include whether the defendant

22  encouraged residents of the forum state to engage in relevant

23  contacts with the defendant, whether there is evidence that the

24  contacts constitute a continuous and substantial part of the

25  defendant's business, whether the defendant exchanged messages with

26  forum residents or gained subscribers through its contacts, or

27  whether the defendant otherwise purposefully availed itself of the

28

privilege of doing business in the forum.  <u>Cybersell, Inc.</u>, 130 F.3d at 419; <u>see</u> <u>CompuServe, Inc. v. Patterson</u>, 89 F.3d 1257 (6th Cir. 1996) (finding jurisdiction where defendant entered into contract to distribute shareware via server located in forum state).

Here, there is little question that Sharman has knowingly and purposefully availed itself of the privilege of doing business in California.  First, Sharman essentially does not dispute that a significant number of its users - perhaps as many as two million - are California residents.[6]  Indeed, given that Sharman's KMD software has been downloaded more than 143 million times,[7] it would be mere cavil to deny that Sharman engages in a significant amount of contact with California residents.

Second, Sharman does not dispute that the distribution of its software is an essentially commercial act.  While the KMD software is freely available, it is distributed for the singular purpose of facilitating advertising and otherwise generating income for Sharman. Moreover, Sharman enters into a licensing agreement with every user authorizing and limiting use of the software.  While Sharman may not

---

[6]     Plaintiffs claim that the Kazaa software has been downloaded by at least 20 million U.S. users.  (<u>See</u> Reyes Decl., Exh. 34.)  Plaintiffs base this estimate on a May 28, 2002 statement by a representative of one of Sharman's third-party advertising vendors, which is admissible pursuant to Rule 801(d)(2) of the Federal Rules of Evidence.  Because California accounts for twelve percent of the U.S. population, Plaintiffs reasonably conclude that at least two million California residents have downloaded the software.  (Opp. at 5.)  Defendant responds primarily by arguing that "[n]o figures of this kind have ever been developed or documented by Sharman."  (Reply at 11.)  Notably, Sharman does not argue that Plaintiffs' figure is somehow inaccurate.

[7]     CNET's Download.com, the website Sharman uses to track the number of times its software is downloaded, recently reported 143,056,276 total downloads.  (<u>See</u> Reyes Decl., Exh. 74.)

1    ask each user where he or she is located, and may therefore not know

2    exactly how many agreements it has entered into with California

3    residents, Sharman is at least constructively aware that many such

4    agreements are executed daily.[8]

5        In sum, Sharman engages in a significant quantum of commercial

6    contact with California residents constituting a but for cause of

7    Plaintiffs' claims.  Jurisdiction is therefore presumptively

8    reasonable.

9

10                    3)   Alternative Basis for Purposeful Availment:

11                         Effects Test

12       Even if purposeful availment were not manifested by Sharman's

13   commercial contacts, it nonetheless may be demonstrated through the

14   "effects test."  Because the Court has already concluded that

15   Plaintiffs have established a prima facie case of purposeful

16   availment, however, the following merely articulates a partial

17   alternative basis for its conclusion.

18   ─────────────────

19       [8]    Sharman argues that these agreements are nothing more than
     "passive notification" to potential customers of the terms of the
20   software's use, and that such "clickwrap" agreements do not support
     personal jurisdiction.  (Reply at 11.)  Sharman's citation to
21   Westcode, Inc. v. RBE Elecs. Inc, 2000 WL 124566 (E.D. Pa. Feb. 1,
     2000), for this contention actually undermines its argument.  The
22   agreement at issue in Westcode was an acknowledgment of the terms and
     condition for use of defendant's website.  Id., at *6.  However, the
23   website "simply [sought] to provide information to interested
     parties."  Id.  Because the website was a passive, informational
24   site, an agreement regulating its use bore "no relationship to the
     sale of goods."  Id., at *6 n.2.  Here, the KMD software is designed
25   as a commercial product, and the agreement is designed to authorize
     and facilitate an essentially commercial relationship between Sharman
26   and its users.  Moreover, the Westcode court noted the absence of any
     evidence that a significant number of forum residents accessed the
27   site.  Id., at *6.  Here, there is evidence that perhaps two million
     forum residents have downloaded and use Sharman's product.
28

1.   <u>Legal Standards</u>

Even where a defendant does not directly contact the forum state, purposeful availment may be demonstrated where the effects of a defendant's conduct are felt in the forum state.  <u>Calder v. Jones</u>, 465 U.S. 783, 104 S. Ct. 1482 (1984) (establishing the "effects test" for personal jurisdiction); <u>Panavision Int'l L.P. v. Toeppen</u>, 141 F.3d 1316, 1321-22 (9th Cir. 1998) (sustaining jurisdiction over a non-resident defendant who registered Internet domain names that infringed plaintiff's trademarks).  Under the <u>Calder</u> line of cases, personal jurisdiction is appropriate where a non-resident defendant engages in "(1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered - and which the defendant knows is likely to be suffered - in the forum state."  <u>Panavision</u>, 141 F.3d at 1321 (quoting <u>Core-Vent Corp. v. Nobel Industries AB</u>, 11 F.3d 1482, 1486 (9th Cir. 1993)).

Sharman does not dispute that jurisdiction typically is appropriate where a foreign defendant engages in significant infringement of a resident's intellectual property, and knows where the harm from that infringement is likely to be suffered.  (<u>See</u> Sharman Reply at 6-7.)  <u>See</u> <u>Panavision</u>, <u>supra</u>; <u>Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club</u>, 34 F.3d 410 (7th Cir. 1994) (upholding Indiana jurisdiction in trademark infringement action by National Football League's Indianapolis Colts against Canadian Football League's Baltimore CFL Colts).

Rather, Defendant argues that the effects test, as applied by <u>Calder</u> and its progeny, has not been used to establish jurisdiction against someone "<u>other</u> <u>than</u> the actual wrongdoer directly causing the

harm. . . ."  (Sharman Reply at 7.)  According to Sharman, the effects test requires an intent to cause a "tortious effect" within the forum state.  (Sharman Reply at 8.)  Sharman concludes that because the primary claims in this case arise from direct infringement by its users, and not by Sharman itself, the effects test does not apply.  (<u>Id.</u> at 9.)

Although there is some merit to these contentions, Sharman does not adequately distinguish between Plaintiffs' theories of liability. The effects test is likely sufficient to show purposeful availment for purposes of the contributory infringement claims, while it might not be able to support an exercise of jurisdiction over the vicarious infringement claims.


### 2.   Contributory Infringement

Contributory infringement originated in tort and "stems from the notion that one who *directly contributes* to another's infringement should be held accountable."  <u>Fonovisa, Inc. v. Cherry Auction, Inc.</u>, 76 F.3d 259, 264 (9th Cir. 1996) (emphasis added).  Thus, the traditional statement of the doctrine, adopted in this circuit, is that "[o]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer."  <u>Gershwin Publishing Corp. v. Columbia Artists Management, Inc.</u>, 443 F.2d 1159, 1162 (2d Cir. 1971), <u>cited in</u> <u>Fonovisa, Inc.</u>, 76 F.3d at 264.  In other words, "liability exists if the defendant engages in personal conduct that encourages or assists the infringement."  <u>A&M Records v. Napster, Inc.</u>, 239 F.3d 1004, 1019 (9th Cir. 2001) ("<u>Napster</u>")

(internal quotations omitted).  At the risk of turning the test into a tautology, contributory infringement will lie only where the defendant *contributed* to the infringement, i.e., knowingly and intentionally assisted, induced or caused the infringement.

Therefore, to prevail on their contributory infringement claim, Plaintiffs will have to show that Sharman *intended to contribute* to the infringing conduct of another.  Under Napster, 239 F.3d at 1020-21, it would be insufficient for Plaintiffs in this case to allege simply that Defendants' peer-to-peer file sharing software may be used to infringe Plaintiffs' copyrights.

Indeed, Plaintiffs allege that Defendants have infringed Plaintiffs copyrights through "willful, intentional and purposeful" conduct.  (See MGM v. Grokster FAC ¶64).  To this effect, Plaintiffs complain that Defendants: 1) actively participated in the unauthorized distribution and reproduction of copyrighted works, and 2) provided the means and facilities for, and encouraged users to engage in, unauthorized reproduction and distribution of copyrighted works.  (See MGM v. Grokster FAC ¶¶ 58-59, 62.)

However, the effects test is not satisfied simply by showing that the tortious act was intentional.  Rather, the intentional conduct "must be targeted at a plaintiff whom the defendant knows to be a resident of the forum state."  Bancroft & Masters, 223 F.3d at 1087.  Plaintiffs allege, and Sharman does not dispute, that Sharman was and is aware that much of the alleged copyright infringement affects Defendants.  (Opp. at 5, 13-14) (Sharman was aware of this litigation when it acquired Kazaa BV's assets, and Plaintiffs have sent notices of millions of separate infringements committed by Kazaa

users to both Kazaa BV and Sharman).  Moreover, Sharman is and has

been well aware of the charge that its users are infringing

copyrights, and reasonably should be aware that many, if not most,

music and video copyrights are owned by California-based companies.[9]

---

[9]     Sharman argues that the California Supreme Court decision in Pavlovich v. Superior Court, 2002 Cal. LEXIS 7959 (Cal. Nov. 25, 2002), which was recently stayed by the U.S. Supreme Court pending further briefing, is persuasive in its holding that awareness of possible injury to California-based industries does not satisfy the knowledge prong of the effects test.  In Pavlovich, a sharply divided California Supreme Court reversed an appeals court decision upholding jurisdiction in California over defendant Pavlovich, a Texas resident.  Pavlovich's sole contact with California consisted of posting on the Internet the source code for a DVD encryption system licensed by the plaintiff, an entertainment trade association based in California.  Id., at *4.  The system was intended principally to prohibit unauthorized reproduction of copyrighted motion pictures distributed on DVD.  Id.

The trade association argued in part that jurisdiction was proper because Pavlovich knew the posting would harm not only the licensor trade association, but also "the motion picture, computer and consumer electronics industries centered in California." Id., at *22-23.  A bare four-judge majority found that this did not satisfy the "effects test" for purposeful availment.  Id., at *25.

However, the majority highlighted key facts that led to their conclusion, and that distinguish the Pavlovich case from the instant actions.  First, the court questioned whether the argument was relevant at all, since the trade association did not assert a claim for illegal pirating of copyrighted works.  Id., at *26.  Thus, any eventual injury to the entertainment industry from such pirating was largely speculative, particularly considering that licensing of the encryption standard to entertainment companies did not begin until two months after Pavlovich posted the source code.  Id., at *23, 26.  Second, the court emphasized that "there is no evidence that any California resident ever visited, much less downloaded the [source code]" from Pavlovich's website.  Id., at *22.

Consequently, the majority conceded the narrowness of its holding, and observed that "[a] defendant's knowledge that his tortious conduct may harm industries centered in California is undoubtedly relevant to any determination of personal jurisdiction and may support a finding of jurisdiction."  Id., at *31 (emphases added).  Indeed, the majority held only "that this knowledge alone is insufficient to establish express aiming at the forum state as required by the effects test."  Id., at *31 (emphasis original).

In this case, there is evidence of continuous and substantial contact with forum residents in addition to the alleged injuries.

(See Reyes Decl., Exh. 5, Deposition of Jeffrey Rose, at 135-136, 138-139.)   See Panavision, 141 F.3d at 1321 (effects test satisfied because defendant likely knew that plaintiff would suffer harm in California, since "its principal place of business was in California, and the heart of the theatrical motion picture and television industry is located there.").

Thus, Plaintiffs have alleged that Sharman intentionally and materially contributed to the infringement of Plaintiffs' works, and that it did so with full knowledge that much of the harm from this infringement would be suffered in California.[10]  This is sufficient to establish a prima facie case of purposeful availment under the effects test of Panavision.[11]

---

Sharman is also aware of this and similar litigation, and has received from Defendants myriad notices of alleged infringement. Accordingly, knowledge of likely injury to the entertainment industry is only one facet of Sharman's general knowledge that its alleged conduct was and is likely to injure California residents.  Thus, even if this Court were governed by Pavlovich (which it is not), it is apparent that the potential injury to California-based industries would be an important "effects test" factor, whether or not it is dispositive.

[10]   Defendant's contention that "none of the harm complained of was intended by the non-resident defendant Sharman," (Sharman Reply at 9), goes to the merits of the action, not to whether Plaintiffs have made a prima facie case of jurisdiction.

[11]   Several courts have exercised jurisdiction in analogous contexts.  See, e.g., Alto Prods. Corp v. Ratek Indus., 1996 U.S. Dist. LEXIS 12812 (S.D.N.Y. Sept. 3, 1996) (jurisdiction in Lanham Act case where foreign defendant had no contact with forum state other than in-state sales through a distributor with knowledge the distributor was selling in the forum) (citing Levi Strauss & Co. v. Textiles Y Confecciones Europeas, S.A., 222 U.S.P.Q. (BNA) 971 (S.D.N.Y. 1983) (jurisdiction in contributory trademark infringement claim in similar circumstances)); Blue Ribbon Pet Prods., Inc. v. Rolf C. Hagen (USA) Corp., 66 F. Supp. 2d 454, 460 (E.D.N.Y. 1999) ("Canada's out-of-state acts contributed to or induced Hagen USA's infringement . . . within New York and are sufficient to subject it

### 3. <u>Vicarious Liability</u>

Sharman's argument appears to have more merit as applied to the vicarious liability claims. As the <u>Napster</u> court noted, vicarious liability "is an 'outgrowth' of respondeat superior." 239 F.3d at 1022 (citing <u>Fonovisa</u>, 76 F.3d at 262). Though claims for vicarious copyright infringement extend beyond the employer/employee context, they are limited to those cases where the defendant "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." <u>Id.</u> (quoting <u>Gershwin</u>, 443 F.2d at 1162).

Notably, however, neither an intent to infringe nor knowledge of direct infringement is an element of this tort. <u>See</u> <u>Napster</u>, 239 F.3d at 1022-24 (failure to police system combined with financial interest in ongoing infringement sufficient to justify preliminary injunction); <u>Shapiro Bernstein and Co. v. H. L. Green Co.</u>, 316 F.2d 304 (2d Cir. 1963) (imposing vicarious liability on owner of department store chain for infringing sales by independent concessionaire, despite fact that owner was unaware of the infringement).

Thus, it is somewhat doubtful that the alleged acts comprising vicarious liability are sufficient to satisfy the intentional act and express aiming requirements of the effects test under <u>Panavision</u>. <u>See also</u> <u>Bancroft & Masters</u>, 223 F.3d at 1087. Nonetheless, because the Court has concluded that purposeful availment is otherwise demonstrated in these cases, it is unnecessary to conclude that the effects test alone demonstrates purposeful availment for all claims.

---

to personal jurisdiction in New York").

-25-

1          b)    <u>Reasonableness</u>

2       Even where sufficient minimum contacts are demonstrated, an

3 exercise of personal jurisdiction is constitutional only if

4 "reasonable."[12] <u>Burger King</u>, 471 U.S. at 476-78; <u>Insurance Co. of</u>

5 <u>North America v. Marina Salina Cruz</u>, 649 F.2d 1266, 1270 (9th Cir.

6 1981). Conversely, considerations of reasonableness may justify

7 jurisdiction upon a lesser showing of contacts than is customarily

8 required. <u>Burger King</u>, 471 U.S. at 477; <u>Ochoa v. J.B. Martin & Sons</u>

9 <u>Farms</u>, 287 F.3d 1182, 1189 n.2 (9th Cir. 2002).

10       Thus, notwithstanding the analysis above, the due process

11 inquiry "cannot be simply mechanical or quantitative," nor can it be

12 resolved by determining whether a defendant's conduct is "a little

13 more or a little less" than some theoretical threshold.

14 <u>International Shoe</u>, 326 U.S. at 319. Rather, "[t]he essence of the

15 issue here, at the constitutional level, is . . . one of general

16 fairness to the corporation." <u>Perkins</u>, 342 U.S. at 445.

17       This fairness consists principally of ensuring that jurisdiction

18 over a person is not exercised absent "fair warning that a particular

19 activity may subject [that] person to the jurisdiction of a foreign

20 sovereign." <u>Shaffer v. Heitner</u>, 433 U.S. 186, 218, 97 S. Ct. 2569

21 (1977) (Stevens, J., concurring in the judgment), <u>quoted in</u> <u>Burger</u>

22 <u>King</u>, 471 U.S. at 472. In other words, the Due Process Clause gives

23 "a degree of predictability to the legal system that allows potential

24 defendants to structure their primary conduct with some minimum

25

26       [12]    An otherwise valid exercise of jurisdiction is presumed to be reasonable, however, and the burden is upon the defendant to

27 "present a compelling case" that it is not. <u>Ballard v. Savage</u>, 65 F.3d 1495, 1500 (9th Cir. 1995) (quoting <u>Burger King</u>, 471 U.S. at

28 477).

1   assurance as to where that conduct will and will not render them

2   liable to suit." World-Wide Volkswagen, 444 U.S. at 297.

3   Accordingly, the touchstone constitutional inquiry is whether

4   the defendant's "conduct and connection with the forum State are such

5   that he should reasonably anticipate being haled into court there."

6   Id., quoted in Calder v. Jones, 465 U.S. at 790, and Kulko v.

7   Superior Court, 436 U.S. at 97-98; see also Gordy v. Daily News,

8   L.P., 95 F.3d 829, 832 (9th Cir. 1996) (this inquiry is the

9   "touchstone" of due process); Lake v. Lake, 817 F.2d 1416, 1421 (9th

10  Cir. 1987) ("fundamental determination"); Sher v. Johnson, 911 F.2d

11  1357, 1361 (9th Cir. 1990).

12  Plaintiffs clearly have carried their burden in this respect.

13  Sharman provides its KMD software to millions of users every week,

14  and executes a licensing agreement with each user permitting use of

15  the software.  Sharman has not denied and cannot deny that a

16  substantial number of its users are California residents, and thus

17  that it is, at a minimum, constructively aware of continuous and

18  substantial commercial interaction with residents of this forum.

19  Further, Sharman is well aware that California is the heart of the

20  entertainment industry, and that the brunt of the injuries described

21  in these cases is likely to be felt here.  It is hard to imagine on

22  these bases alone that Sharman would not reasonably anticipate being

23  haled into court in California.

24  However, jurisdiction is reasonable for an important added

25  reason: Sharman's effective predecessor, Kazaa BV, was engaged in

26  this very litigation when Sharman was formed.  Sharman was apparently

27  created for the sole purpose of acquiring Kazaa BV's key assets and

28

-27-

taking over operation of the Kazaa system. Sharman assumably was aware when it formed that Kazaa BV had not contested jurisdiction in this litigation, but rather had answered and counterclaimed in both cases. Had Sharman actually acquired and merged with Kazaa BV, there is little question that Sharman would be held to answer in this Court in place of Kazaa BV. Because Sharman has succeeded Kazaa BV in virtually every aspect of its business, Sharman reasonably should have anticipated being required to succeed Kazaa BV in this litigation as well. If Sharman wished to "structure [its] primary conduct with some minimum assurance" that it would not be haled into court in this forum, it simply could have avoided taking over the business of a company already enmeshed in litigation here.

Nor has Sharman made a "compelling case" that jurisdiction would be unreasonable on the basis of any of the other factors considered with respect to reasonableness: 1) the extent of the defendant's purposeful interjection into the forum state's affairs; 2) the burden on the defendant; 3) conflicts with the sovereignty of defendant's state/nation; 4) the forum's interest in adjudicating the dispute; 5) the most efficient judicial resolution of the dispute; 6) the plaintiff's interest in convenient and effective relief; and, 7) the existence of an alternative forum. <u>Sinatra v. National Enquirer, Inc.</u>, 854 F.2d 1191, 1198-99 (9th Cir. 1988).

### 1)   Purposeful Interjection

The factor of purposeful interjection is satisfied by a finding of purposeful availment, discussed <u>supra</u>. <u>See</u> <u>Roth v. Garcia Marquez</u>, 942 F.2d 617, 623 (9th Cir. 1991); <u>Sinatra</u>, 854 F.2d at

1199; <u>Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.</u>, 784

F.2d 1392, 1401 (9th Cir. 1986).

2)   Burden on the Defendant

The Court is sensitive to the considerable burden placed on a

defendant forced to litigate in a foreign country under foreign law.

<u>See, e.g.</u>, <u>Asahi Metal Industry Co. v. Superior Court of California</u>,

480 U.S. 102, 114, 107 S. Ct. 1026 (1987).  However, "modern advances

in communications and transportation have significantly reduced the

burden of litigating in a foreign country."  <u>Sinatra</u>, 854 F.2d at

1199; <u>see</u> <u>also</u> <u>Sher v. Johnson</u>, 911 F.2d at 1365.  Moreover, this

factor is less salient where the defendant speaks English and has

traveled to the forum on business related to the instant action.  <u>See</u>

<u>Dole Food Co. v. Watts</u>, 303 F.3d 1104, 1115 (9th Cir. 2002).

Sharman's principal, employees and representatives speak

English, and have shown considerable facility interacting with this

forum.  As discussed <u>supra</u>, Sharman has engaged in extensive contacts

with the forum, including the retention of public relations

representatives and law firms for purposes other than this

jurisdictional challenge, negotiations in California of at least one

contract, commercial relationships with California companies, and the

assumption of contracts with California forum and choice of law

provisions.  The burden of litigating in this forum is thus not so

great as to "overcome [the] clear justifications for the exercise of

jurisdiction."  <u>Caruth v. International Psychoanalytical Ass'n</u>, 59

F.3d 126, 128-29 (9th Cir. 1995).

1                     3)    Conflicts with Law and Sovereignty of

2                         Foreign State

3     The Supreme Court has indicated that courts should be cautious

4 in extending "long-arm" jurisdictional statutes in the international

5 context.  "'Great care and reserve should be exercised when extending

6 our notions of personal jurisdiction into the international field.'"

7 <u>Asahi Metal Industry Co.</u>, 480 U.S. at 115 (quoting <u>United States v.</u>

8 <u>First National City Bank</u>, 379 U.S. 378, 404, 85 S. Ct. 528 (1965)).

9 However, "this factor is not dispositive because, if given

10 controlling weight, it would always prevent suit against a foreign

11 national in a United States court."  <u>Haisten</u>, 784 F.2d at 1401-02

12 (quotation omitted).  Further, it weighs less heavily where, as here,

13 the defendant engages in significant contact with the forum state.

14 See <u>Sinatra</u>, 854 F.2d at 1199 (defendant maintained an agent in

15 California, advertised heavily there, and considered California a top

16 source of American clients).

17

18                     4)    Forum State's Interest in Adjudicating the

19                         Dispute

20     California has an interest in providing effective judicial

21 redress for its citizens.  <u>Sinatra</u>, 854 F.2d at 1200.  This interest

22 is particularly strong where the claim is one for tortious injury.

23 <u>See, e.g.</u>, <u>Panavision</u>, 141 F.3d at 1323 (trademark infringement);

24 <u>Gordy v. Daily News</u>, 95 F.3d at 836 (defamation); <u>Plant Food Co-Op v.</u>

25 <u>Wolfkill Feed & Fertilizer Corp.</u>, 633 F.2d 155 (9th Cir. 1980)

26 (breach of warranty).  Because the claims in this case implicate

27

28

widespread, pervasive infringement of copyrights owned by California residents, the state's interest is considerable.

### 5)   Efficiency of the Forum

In determining the efficiency of the forum, the Court looks primarily at where the evidence and witnesses are likely to be located. Panavision, 141 F.3d at 1324; Caruth, 59 F.3d at 129; Core-Vent Corp., 11 F.3d at 1489; Sinatra, 854 F.2d at 1200. At first blush, this factor would seem to favor a forum in Australia or Vanuatu, at least with respect to Sharman, since that is where Sharman is operated and where evidence and witnesses regarding Sharman's conduct seem most likely to be located. Plaintiffs have, however, identified a number of fact witnesses located in California and other U.S. states. (Opp. at 24.) Furthermore, discovery and other aspects of these cases proceeded for some time in this Court prior to Sharman's formation, acquisition of the Kazaa system, and addition as a Defendant. The Court is thus already immersed in this litigation and best suited to adjudicate it.

### 6)   Convenient and Effective Relief for Plaintiff

While litigating in Australia or Vanuatu would undoubtedly be inconvenient for Plaintiffs, little weight has been given to this factor. Panavision, 141 F.3d at 1324 (citing Ziegler, 64 F.3d at 476). This is particularly true where, as here, Plaintiffs have considerable resources and could litigate elsewhere if necessary. However, Sharman has not demonstrated that *effective* relief –

1  remedies for infringement of U.S. copyrights within the United States

2  - would be available other than in a U.S. forum (see infra).

3

4          7)   Existence of an Alternative Forum

5      The plaintiff bears the burden of establishing that an

6  alternative forum is not available, though this factor is significant

7  only if other factors weigh against an exercise of jurisdiction.

8  Corporate Inv. Business Brokers v. Melcher, 824 F.2d 786, 791 (9th

9  Cir. 1987); Pacific-Atlantic Trading Co. v. M/V Main Express, 758

10  F.2d 1325, 1331 (9th Cir. 1985).  Although Australia or Vanuatu might

11  be alternative forums for suing Sharman, it is not clear that the

12  non-Australian co-Defendants would be amenable to service of process

13  in either country.  Moreover, these are suits under U.S. law for

14  copyright infringement within the United States.  Thus, even if a

15  foreign court were available to hear this litigation, it would be

16  forced to interpret U.S. law.  "This fact alone militates heavily in

17  favor of this Court's assertion of jurisdiction."  Batzel v. Smith,

18  2001 U.S. Dist. LEXIS 8929, at *12 (C.D. Cal. June 6, 2001).

19      In sum, Sharman has not made a "compelling case" that the

20  otherwise appropriate exercise of jurisdiction is unreasonable in

21  these circumstances.  Thus, specific jurisdiction over Sharman is

22  consistent with constitutional due process.

23

24      4)   Nationwide Aggregation

25      Finally, the Court notes that even if jurisdiction over Sharman

26  were unavailable in California state courts, it would nonetheless be

27  appropriate in this Court on the basis of Sharman's aggregated U.S.

28

1   contacts.  Rule 4(k)(2) of the Federal Rules of Civil Procedure

2   permits nationwide aggregation for cases arising under federal law,

3   unless 1) the defendant is subject to jurisdiction of the courts of

4   general jurisdiction of any state, or 2) aggregation is expressly

5   forbidden by the relevant law.  <u>See</u> Fed. R. Civ. P. Rule 4(k)(2);

6   <u>Quokka Sports, Inc. v. Cup Int'l Ltd.</u>, 99 F. Supp. 2d 1105, 1110-11

7   (N.D. Cal. 1999).

8       Although Fifth Amendment due process governs the

9   constitutionality of jurisdiction under Rule 4(k)(2), the Fourteenth

10  Amendment's protections are analogous, and the same "minimum

11  contacts" analysis is applied.  <u>See, e.g.</u>, <u>Central States, Southeast</u>

12  <u>& Southwest Areas Pension Fund v. Reimer Express</u>, 230 F.3d 934, 946

13  n.10 (7th Cir. 2000); <u>Aerogroup Int'l v. Marlboro Footworks</u>, 956 F.

14  Supp. 427, 439 (S.D.N.Y. 1996) (collecting cases).  The effect of the

15  Rule in cases such as this is that jurisdiction may be exercised over

16  copyright claims against a foreign defendant where sufficient

17  contacts with, or injury to, U.S. residents is alleged, even though

18  there are not sufficient contacts with any single state to justify

19  jurisdiction in that state.  <u>See</u> Jane C. Ginsburg, <u>Copyright Without</u>

20  <u>Borders? Choice of Forum and Choice of Law for Copyright Infringement</u>

21  <u>in Cyberspace</u>, 15 Cardozo Arts & Ent. LJ 153, 161-65 (1997).

22      The analysis set forth <u>supra</u> applies even more forcefully when

23  Sharman's nationwide contacts are considered.  First, Sharman's

24  commercial availment of and contact with the U.S. forum is manifestly

25  and geometrically greater than that of and with the California forum.

26  Second, Sharman's distribution of its software to U.S. residents is a

27  but for cause of all of the infringement alleged in this case, even

28

if use by California residents is a but for cause of only a portion of that injury.  Additionally, to the extent that the injuries alleged in these cases did not foreseeably accrue to California residents, there is little doubt that Sharman knows or should know that the vicarious or contributory infringement of media copyrighted by U.S. persons under U.S. law is likely to injure U.S. residents.

In sum, even if Sharman could not reasonably anticipate being haled into a court in this *state*, it certainly could reasonably anticipate being haled into a court in this *country*.  Thus, jurisdiction could be exercised constitutionally in this Court pursuant to Rule 4(k)(2) even if it could not be so exercised by California state courts.

### B.   **Venue**

Sharman also moves for dismissal for improper venue.  If personal jurisdiction in a copyright case may be exercised over a corporation in a district, then venue also is proper in that district.  28 U.S.C. §1400; <u>Colt Studio, Inc. v. Badpuppy Enter.</u>, 75 F. Supp. 2d 1104, 1112 (C.D. Cal. 1999).  Because the Court concludes that jurisdiction is proper in this district, venue is proper as well.

### C.   **Forum Non Coveniens**

Sharman additionally moves for dismissal on the grounds of forum non coveniens.  The plaintiff's chosen forum "should rarely be disturbed" unless the balance of interests "is strongly in favor of the defendant."  <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 508, 67 S.

Ct. 839 (1947).  Key in this analysis is the availability of an alternative forum where *all* defendants are amenable to personal jurisdiction.  <u>Watson v. Merrell Dow Pharmaceuticals</u>, 769 F.2d 354, 357 (6th Cir. 1985); <u>In re Air Crash Disaster Near New Orleans, La. on July 9, 1982</u>, 821 F.2d 1147, 1168-69 (5th Cir. 1987).  Sharman has made no showing that its non-Australian co-Defendants are amenable to suit in Australia or Vanuatu.  Moreover, while it is irrelevant that an alternative forum's law may be *unfavorable* to Plaintiffs' claims, the subject matter of the dispute must at least be actionable there.  <u>See Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 252-54, 102 S. Ct. 252 (1981).  Sharman has failed to demonstrate that a derivative action arising from copyright infringement by Sharman's U.S. users – to which these suits are limited – would be available in either Australia or Vanuatu.

Nor has Sharman shown that the balance of private and public interest factors favors dismissal.  <u>See Lockman Foundation v. Evangelical Alliance Mission</u>, 930 F.2d 764, 767 (9th Cir. 1991).  Thus, Sharman has failed to "overcome the great deference . . . due plaintiffs" in their choice of forum.  <u>Ceramic Corp. of Am. v. Inka Maritime Corp.</u>, 1 F.3d 947, 949 (9th Cir. 1993) (quotations omitted).

### D.   **Political Question Doctrine**

Sharman also argues that the Complaint should be dismissed pursuant to the political question doctrine.  Under that doctrine, a court should not rule on a case if the issues to be litigated are best resolved by the political process.

-35-

In the seminal case of <u>Baker v. Carr</u>, 369 U.S. 186 (1962), the Supreme Court explained:

> Prominent on the surface of any case held to
> involve a political question is found a textually
> demonstrable commitment of the issue to a
> coordinate political department; or a lack of
> judicially discoverable and manageable standards
> for resolving it; or the impossibility of deciding
> without an initial policy determination of a kind
> clearly for nonjudicial discretion; or the
> impossibility of a court's undertaking independent
> resolution without expressing lack of respect due
> coordinate branches of government; or an unusual
> need for unquestioning adherence to a political
> decision already made; or the potentiality of
> embarrassment from multifarious pronouncements by
> various departments on one question.

<u>Id.</u> at 217.

The areas where the doctrine principally has been applied are: 1) the Republican Form of Government Clause and the electoral process; 2) foreign affairs; 3) Congress's ability to regulate its internal processes; 4) the process for ratifying constitutional amendments; 5) instances where the federal court cannot shape effective equitable relief; and 6) the impeachment process.  <u>See generally</u> Erwin Chemerinsky, Federal Jurisdiction, at 142-66 (2d ed. 1994).

Sharman seems to argue that a confluence of factors justify invocation of the doctrine, from the international implications of the relief sought, to the judge-made nature of the copyright theories alleged, to the First Amendment protections potentially applicable to the source code at issue in this case.  None of these concerns constitute the types of factors sufficient to divest the Court of jurisdiction under the political question doctrine.  Rather, most relate to the ability of the Court to grant the relief sought by Plaintiffs, and not to the Court's jurisdiction to hear the case.  Consideration of these concerns, particularly those relating to international comity, are appropriate if at all in determining the scope of any relief, should liability be established.

Sharman also seems to argue that the Court should abstain from hearing these cases in light of ongoing congressional evaluation of the technologies implicated.  Sharman cites <u>Sony v. Universal Studios, Inc.</u>, 464 U.S. 417, 104 S. Ct. 774 (1984):

> The judiciary's reluctance to expand the protections
> afforded by the copyright without explicit
> legislative guidance is a recurring theme.
> [Citations.]  Sound policy, as well as history,
> supports our consistent deference to Congress when
> major technological innovations alter the market for
> copyrighted materials.  Congress has the
> constitutional authority and the institutional
> ability to accommodate fully the raised permutations
> of competing interests that are inevitably implicated
> by such new technology.

-37-

1        In a case like this, in which Congress has not

2        plainly marked our course, we must be circumspect in

3        construing the scope of rights created by a

4        legislative enactment which never calculated such a

5        calculus of interests.

6 464 U.S. at 431 (citations omitted).

7     Indeed, if and when this Court reaches the merits of the claims

8 against Defendants, it will be obligated to bear in mind these and

9 other invocations of the Supreme Court.  But the quoted language

10 relates to statutory construction, not to jurisdiction.  Nothing in

11 <u>Sony</u> suggests that this Court should refuse to hear the instant cases

12 merely because they present novel or dynamic questions of law.  The

13 Court cannot abstain from adjudicating actions properly before it

14 based upon mere speculation or hope that greater legislative guidance

15 may one day be afforded.

16

17     E.   **Sharman's Extraterritorial Activities**

18     Sharman also contends that the Court does not have subject

19 matter jurisdiction over the case because Sharman's allegedly

20 wrongful conduct purportedly takes place entirely outside the United

21 States, and because U.S. law cannot be applied extraterritorially

22 unless Congress so authorizes.  <u>See</u> <u>EEOC v. Arabian Am. Oil Co.</u>, 499

23 U.S. 244, 248 (1991).

24     While Sharman argues that its alleged wrongful acts are not

25 covered by the Copyright Act, the very case cited for this

26 proposition holds otherwise.  <u>See</u> <u>Armstrong v. Virgin Records, Ltd.</u>,

27 91 F. Supp. 2d 628, 635-36 (S.D.N.Y. 2000).  <u>Armstrong</u> is a case in

28

1  which, in Sharman's own words, the court held that "United States

2  courts can exercise subject matter jurisdiction under the Copyright

3  Act over foreign defendants whose extraterritorial acts aid, induce

4  or contribute to copyright infringement by another within the United

5  States." (Sharman Mot. at 8.)  See also ITSI T.V. Prods., Inc. v.

6  California Auth. of Racing Fairs, 785 F. Supp. 854, 864 (E.D. Cal.

7  1992) ("To satisfy the jurisdictional requirement that the defendant

8  commit an act of infringement in the United States, the plaintiff

9  must show only that the direct act of infringement for which

10  defendant is contributorily or vicariously liable occurred in the

11  United States."), rev'd in part on other grounds, 3 F.3d 1289 (9th

12  Cir. 1993).  This is precisely what is alleged here.

13

14  **IV.   LEF'S MOTION TO DISMISS**

15       A.   **The Parties' Arguments**

16       Defendant LEF Interactive PTY, Ltd. ("LEF") moves to dismiss for

17  lack of personal jurisdiction only.  LEF contends that it is "a

18  management company that merely provides services to other businesses,

19  one of whom is [Sharman]." (Memo of P&A in Support of LEF's Mot. to

20  Dismiss ("LEF Mot."), at 1.)  LEF argues that it does not own or

21  operate the Kazaa system or have any other relationship with the

22  conduct charged in these actions. (Id.)  Rather, LEF asserts, it is

23  an Australian business with no connection to this case, and no other

24  contacts with the United States or California. (Id.)  Naming LEF as

25  a Defendant, it adds, "makes no more sense than naming Sharman's

26  accountants." (Id.)

27

28

-39-

Plaintiffs assert, in contrast, that LEF and Sharman are virtually coterminous. For instance, they were formed at the same time, February 2002, by the same principal and owner, Nicola Hemming. Every LEF employee has only Sharman as a paying client, and all of LEF's revenue comes from Sharman. (Pls.' Opp. to LEF's Mot. ("Opp."), at 11.) Plaintiffs add that LEF has interchangeably referred to itself as Sharman or LEF, that LEF's employees are or were listed on the Kazaa.com website as members of "the Sharman team," that LEF's office door and letterhead bear the Kazaa logo, and that there is no independent LEF e-mail address - employees receive e-mail at "sharmannetworks.com." (Id.) Finally, until recently, Sharman and LEF shared the same phone number, and LEF answered the phone "Sharman Networks." (Id.) In short, Plaintiffs claim, LEF was formed for the sole purpose of operating nearly every aspect of Sharman's business. (Id. at 10.)

Therefore, Plaintiffs argue that LEF and Sharman are corporate alter egos, and thus that personal jurisdiction over Sharman may be imputed to LEF. (See Opp. at 21.) Indeed, LEF's counsel conceded at hearing on this Motion that employees of LEF do conduct much of Sharman's business. LEF maintains that management relationships such as this are common in Australia, however, and that they do not automatically render the management company amenable to suit in any jurisdiction into which the client corporation may be haled. Rather, LEF contends, jurisdiction does not exist because LEF does not independently have sufficient "minimum contacts" with the forum.

///

///

-40-

1

B.   **Analysis**

2

1.   Corporate Alter Ego

3    Plaintiffs posit the jurisdictional inquiry as a question of

4    corporate alter ego.   Under the alter ego doctrine, one corporation

5    may be liable for the actions of another where it is shown that "'(1)

6    there is such unity of interest and ownership that the separate

7    personalities of [the corporations] no longer exist and (2) that

8    failure to disregard [their separate identities] would result in

9    fraud or injustice.'"  AT&T v. Compagnie Bruxelles Lambert, 94 F.3d

10   586, 591 (9th Cir. 1996) (quoting Watson v. Commonwealth Ins. Co., 8

11   Cal. 2d 61, 63, P.2d 295, 298 (Cal. 1936)).   Where a parent company

12   is the corporate alter ego of a subsidiary, the forum contacts of the

13   subsidiary may be imputed to the parent for purposes of establishing

14   personal jurisdiction.   See, e.g., Doe v. Unocal Corp., 248 F.3d 915,

15   926 (9th Cir. 2001); AT&T, 94 F.3d at 591.

16   Plaintiffs assert and the Court agrees that there is a clear

17   unity of interest between Sharman and LEF.

18   The second prong of the alter-ego analysis, whether disregarding

19   the companies' separate identities would result in fraud or

20   injustice, often looks to whether corporate formalities are ignored,

21   or to whether one company is undercapitalized in an attempt to shield

22   the alter ego from financial liability.   See, e.g., Firstmark Capital

23   Corp. v. Hempel Financial Corp., 859 F.2d 92, 93 (9th Cir. 1988);

24   Flynt Distributing Co., 734 F.2d 1389, 1393-94 (9th Cir. 1984).

25   Here, Plaintiffs have not alleged that Sharman is undercapitalized,

26   or that corporate formalities have been ignored, or that any other

27   fraud has occurred between the two companies.   Rather, Plaintiffs

28

1   make two claims.  First, they argue that a failure to exercise

2   jurisdiction over LEF would insulate Sharman's de facto staff from

3   the Court's discovery jurisdiction.  (See Opp. at 22.)  Thus, they

4   assert, Sharman could simply characterize its "employees" – who

5   technically work for LEF – as foreign third parties from whom

6   evidence cannot be taken.  (Id.)  Second, Plaintiffs contended at

7   hearing on this Motion that full recovery for the alleged

8   infringement of their copyrights would be hindered if LEF and its

9   assets were not subject to this Court's jurisdiction.

10      The Court is skeptical as to whether either of these claims

11  constitutes the type of "fraud or injustice" typically considered

12  sufficient to justify ignoring corporate distinctions.  The Court

13  concludes, however, that Plaintiffs employ the wrong standard.

14

15              2.   Minimum Contacts

16      Many courts conflate the requirements of due process and alter

17  ego liability.  However, the "minimum contacts" approach of

18  International Shoe clearly has supplanted the mechanical, formalistic

19  approach of cases like Cannon Mfg. Co. v. Cudahy Packing Co., 267

20  U.S. 333, 334, 45 S. Ct. 250 (1925) (no jurisdiction where absent

21  parent, and subsidiary present in forum, observe corporate

22  formalities, despite fact that parent dominates subsidiary

23  "immediately and completely").  See In re Teletronics Pacing Systems,

24  Inc., Accufix Atrial "J" Leads Products Liability Litigation, 953 F.

25  Supp. 909, 914-18 (S.D. Ohio 1997) (expanding on the evolution away

26  from these mechanical concepts and the abandonment of corporate alter

27  ego as the relevant jurisdictional inquiry), rev'd on other grounds

28

-42-

221 F.3d 870 (6th Cir. 2000).  As the Sixth Circuit in <u>Velandra v.</u>
<u>Regine Nationale des Usines Renault</u> observed:

> The law relating to the fictions of agency and of separate
> corporate entity was developed for purposes other than
> determining amenability to personal jurisdiction, and the law of
> such amenability is merely confused by reference to these
> inapposite matters.
>
> The International Shoe decision represented an effort by the
> Supreme Court to clarify earlier concepts in the areas of the
> amenability of foreign corporations to the personal jurisdiction
> of state courts by sweeping aside any lingering notions that the
> earlier shibboleths of "consent," "presence," and "doing
> business" were self-defining abstractions, and by redefining
> those tests in terms of "minimum contacts."

336 F.2d 292, 297 (6th Cir. 1964), <u>cited in</u> <u>In re Teletronics Pacing</u>
<u>Systems, Inc.</u>, 953 F. Supp. at 915; <u>see generally</u> Lea Brilmayer and
Kathleen Paisley, <u>Personal Jurisdiction and Substantive Legal</u>
<u>Relations: Corporations, Conspiracies and Agency</u>, 74 Cal. L. Rev. 1
(1986).

Similarly, in <u>Wells Fargo & Co. v. Wells Fargo Express Co.</u>, the
Ninth Circuit reversed a district court's denial of personal
jurisdiction over a nonresident corporation, which the court had
predicated on <u>Cannon</u>.  556 F.2d 406 (9th Cir. 1977).  The circuit
court sent the case back to the district court to consider whether
forum contacts other than those considered under <u>Cannon</u> were
sufficient to establish jurisdiction.  <u>Id.</u> at 426.  Among other
contacts, the Ninth Circuit noted plaintiffs' theory that the in-

1   state subsidiary may have acted as the agent of the out-of-state

2   parent, conducting its forum activities "at the behest, and under the

3   control" of the latter.  Id. at 419.  The Wells Fargo court concluded

4   that all of defendant's contacts, including and in addition to those

5   constituting a possible corporate alter ego relationship, should be

6   considered in the jurisdictional inquiry.  Id. at 419-20.

7        Thus, the controlling question remains whether the defendant has

8   such minimum contacts with the forum state that it should reasonably

9   anticipate being haled into court there.  In the parent-subsidiary

10  context, several courts have articulated this as a requirement that

11  plaintiff show either "(1) attribution, 'that the absent parent

12  instigated the subsidiary's local activity;' or (2) merger, 'that the

13  absent parent and the subsidiary are in fact a single legal entity.'"

14  Third National Bank v. WEDGE Group, 882 F.2d 1087, 1092, 1094 (6th

15  Cir. 1989) (Keith, J., concurring) (quoting Brilmayer & Paisley,

16  supra); In re Teletronics Pacing Systems, Inc., 953 F. Supp. at 918-

17  19 (collecting cases employing similar standards).

18       "The attribution test implies that the in-forum subsidiary is

19  acting on behalf of the absent parent.  Thus, the Court attributes

20  the subsidiary's contacts to the parent because the parent

21  'purposefully avails' itself of doing business in the forum by

22  accessing the market through a subsidiary."  In re Teletronics Pacing

23  Systems, Inc., 953 F. Supp. at 919; see Wells Fargo & Co., 556 F.2d

24  at 419.

25       Under the merger theory of jurisdiction, the two entities are so

26       closely aligned that it is reasonable for the parent to

27       anticipate being "haled" into court in the forum because of its

28

-44-

1  relationship with its subsidiary. Some factors that might

2  indicate a sufficient relationship with the subsidiary to

3  justify jurisdiction include overlap in board of directors and

4  officers, interchange of personnel between the parent and the

5  corporation, exchange of documents and records between parent

6  and subsidiary, listing subsidiary as a branch, agency, or

7  division of the parent, or indicating that subsidiary and parent

8  are part of the same entity . . .

9  In re Teletronics Pacing Systems, Inc., 953 F. Supp. at 919.

10

11         3.   Application to LEF

12         Despite the relatively novel corporate affiliation at issue in

13  the instant actions, the relationship between Sharman and LEF

14  includes the indicia of both attribution and merger.  First,

15  attribution is satisfied by Plaintiffs' showing that Sharman's

16  activities are predominantly instigated or maintained by employees of

17  LEF.  Second, the extensive overlap of corporate operation and

18  perception, described above, shows a tremendous degree of "merger"

19  between the two companies.  As set forth above, Sharman has

20  sufficient contacts with California to subject it to jurisdiction

21  here.  LEF's actions through and with Sharman similarly subject it to

22  jurisdiction in this Court.  Thus, whether or not these facts

23  establish corporate alter ego for purposes of liability, they satisfy

24  the due process jurisdictional inquiry.

25  ///

26  ///

27  ///

28

-45-

**V.   CONCLUSION**

Therefore, the Court hereby DENIES Defendant Sharman Network Ltd.'s Motion to Dismiss the First Amended Complaint for Lack of Subject Matter Jurisdiction and Other Grounds, and DENIES Defendant LEF Interactive's Motion to Dismiss for Lack of Personal Jurisdiction.


IT IS SO ORDERED.

DATED: _1/8/03_

_____
STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE