

FILED
CLERK. U.S. DISTRICT COURT

SEP 2 7 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

ENTERED
CLERK, U.S. DISTRICT COURT

SEP 2 7 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6   *NO*
JS-2/JS-3
Scan Only

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

METRO-GOLDWYN-MAYER STUDIOS, INC., et al.,

                    Plaintiffs,

          v.

GROKSTER, LTD., et al.,

                    Defendants.

_____

JERRY LEIBER, et al.,

                    Plaintiffs,

          v.

CONSUMER EMPOWERMENT BV, et al.,

                    Defendants.

_____

AND RELATED COUNTERCLAIMS

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CV 01-08541 SVW (PJWx)
CV 01-09923 SVW (PJWx)

ORDER GRANTING PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT ON
LIABILITY AGAINST DEFENDANT
STREAMCAST NETWORKS, INC.
[1070]; ORDER DENYING DEFENDANT
STREAMCAST NETWORK, INC.'S,
MOTION FOR A CONTINUANCE
PURSUANT TO RULE 56(f) [1123]

DOCKETED ON CM

SEP 2 7 2006

BY _____ 076

I.   INTRODUCTION

     In October 2001, Plaintiffs – a group of record companies, movie studios, and music publishers – filed a single-count complaint against Defendants Grokster Ltd. ("Grokster"), Consumer Empowerment BV, and

1   the corporate predecessors of StreamCast Networks, Inc.

2   ("StreamCast").  The complaint alleged that Defendants' file-sharing

3   software contributed to massive infringement of copyrighted works

4   owned by Plaintiffs.  On July 12, 2002, Plaintiffs filed the first

5   amended complaint, which dropped Consumer Empowerment BV, replaced

6   StreamCast's corporate predecessors with StreamCast, and also joined a

7   host of Defendants associated with the Kazaa file-sharing network,

8   most notably Sharman Networks ("Sharman").

9        On April 25, 2003, the Court granted summary judgment for

10  Defendants StreamCast and Grokster, and denied Plaintiffs' motions for

11  summary judgment.  Metro-Goldwyn-Mayer Studios, Inc. v. Grokster,

12  Ltd., 259 F. Supp. 2d 1029 (C.D. Cal. 2003).  Because Plaintiffs

13  sought primarily injunctive relief, the Court considered only the

14  then-current versions of Defendants' software, and did not address

15  Grokster and StreamCast's alleged liability for past versions of their

16  software or services.  The Ninth Circuit affirmed the Court's ruling

17  in August 2004.  Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,

18  419 F.3d 1005 (9th Cir. 2005).  The Supreme Court unanimously reversed

19  the grant of summary judgment for Grokster and StreamCast in a

20  decision issued on June 27, 2005.  Metro-Goldwyn-Mayer Studios, Inc.

21  v. Grokster, Ltd., 545 U.S. 913 (2005)(hereinafter "Grokster").  The

22  Supreme Court remanded the case for renewed consideration of

23  Plaintiffs' motions for summary judgment.  Id. at 2782.

24       Defendant Grokster settled with Plaintiffs shortly after the

25  Supreme Court decision.  On February 14, 2006, Plaintiffs filed

26  motions for summary judgment as to the liability of Defendants

27  StreamCast and Sharman.  Defendants filed opposition papers on April

28  7, 2006, along with motions for a Rule 56(f) continuance.  Plaintiffs

                                    2

1   replied on May 1, 2006.  After the motions were fully briefed,

2   Defendant Sharman purportedly reached a tentative settlement agreement

3   with Plaintiffs early in August 2006.  StreamCast is now the only

4   remaining Defendant in this action.

5       For reasons discussed below, the Court GRANTS Plaintiffs' motion

6   for summary judgment as to StreamCast's liability.

7

8   **II.   EVIDENTIARY OBJECTIONS**

9       "A trial court can only consider admissible evidence in ruling on

10  a motion for summary judgment."  Orr v. Bank of Am., 285 F.3d 764, 773

11  (9th Cir. 2002).  Accordingly, as a threshold matter, the Court needs

12  to address StreamCast's evidentiary objections.   StreamCast has

13  objected to nearly all of the voluminous documentary evidence offered

14  by Plaintiffs, which are contained in Exhibits 14 through 17 of

15  Plaintiffs' moving papers.  Exhibits 14 and 15 consist of internal

16  documents produced by StreamCast in discovery, most of which were

17  emails sent or received by StreamCast or its employees, and documents

18  relating to corporate strategy and objectives.  Each email shows on

19  its face the date it was sent and received, as well as the names of

20  the sender and the receiver.  Emails comprise a sizeable  majority of

21  the documents offered into evidence.  In addition, the record contains

22  standalone documents, which were not attached to emails, such as

23  presentation slides, presentation notes, and marketing plans.  Exhibit

24  16 consists of documents produced by KVO Communications, a public

25  relations firm hired by Defendant StreamCast.  Exhibit 17 consists of

26  documents produced by StreamCast's primary investor, Timberline

27  Venture Partners.  StreamCast has objected to each document in these

28  exhibits on the basis of failure to authenticate and hearsay.

1

2        A.    Authentication

3          "The requirement of authentication or identification as a

4    condition precedent to admissibility is satisfied by evidence

5    sufficient to support a finding that the matter in question is what

6    its proponent claims."  Fed. R. Evid. 901(a).  "[T]he rule requires

7    only that the court admit evidence if sufficient proof has been

8    introduced so that a reasonable juror could find in favor of

9    authenticity or identification."  United States v. Tank, 200 F.3d 627,

10   630 (9th Cir. 2000) (internal quotation marks and citations omitted).

11   "[U]nauthenticated documents cannot be considered in a motion for

12   summary judgment."  Orr, 285 F.3d at 773.

13         Authentication can be accomplished by judicial admission, such as

14   stipulation or production of the items at issue in response to a

15   discovery request.  Wright & Gold, 31 Federal Practice & Procedure:

16   Evidence § 7105, at 39.  In Maljack Productions., Inc. v. GoodTimes

17   Home Video Corp., 81 F.3d 881, 889 n.12 (9th Cir. 1996), the Ninth

18   Circuit ruled that the authentication requirement was satisfied where

19   the documents at issue, many of which were printed on the plaintiff's

20   letterhead, were produced in discovery by the plaintiff and offered

21   into evidence by the defendant.  Similarly, in In re Homestore.com,

22   Inc. Securities Litigation, 347 F. Supp. 2d 769, 781 (C.D. Cal. 2004),

23   the court held that the authentication requirement was met because the

24   documents in question were produced during discovery and were offered

25   by the party opponent.  See also Snyder v. Whitaker Corp., 839 F.2d

26   1085, 1089 (5th Cir. 1988) (holding notes were authenticated when the

27   party resisting admissibility produced them in discovery and admitted

28   that the author was its employee.)  In the present case, all of the

1  documents included in Exhibit 14 and 15 were produced by StreamCast in

2  discovery.  This constitutes sufficient circumstantial evidence for a

3  reasonable jury to find the documents authentic.

4      StreamCast argues that the judicial admission rule does not

5  apply to a document produced in discovery when the party that produced

6  the document contests its authenticity.  For this proposition,

7  StreamCast relies solely on language in Maljack indicating that the

8  plaintiff there "did not contest" the authenticity of the challenged

9  documents.  81 F.3d at 889 n.12.  However, the plaintiff in Maljack

10  did dispute authenticity in the sense that it mounted an evidentiary

11  objection on the ground of failure to authenticate.  What the Ninth

12  Circuit meant was that the plaintiff did not specifically deny the

13  authenticity of the documents, in addition to alleging that the party

14  offering the evidence failed to properly authenticate.  StreamCast is

15  in the same position.  StreamCast has only alleged that Plaintiffs

16  have not properly authenticated the documents in Exhibits 14 and 15.

17  StreamCast has not contended that the documents are not what

18  Plaintiffs purport them to be.  That would be a hard argument to make,

19  of course, because StreamCast produced them.  The result here should

20  be no different from that in Maljack.

21      Exhibits 16 and 17, on the other hand, were not produced by

22  StreamCast in discovery but by its public relations firm, KVO

23  Communications, and its primary venture capital investor, Timberline

24  Venture Partners.  In Homestore.com, the court ruled that documents

25  produced by the defendant corporation's auditor were deemed

26  authenticated by virtue of production in discovery when offered

27  against the corporation's CEO.  347 F. Supp. 2d at 781.  It could be

28  argued that Homestore.com is distinguishable because the auditor was a

1    co-defendant there, whereas in the instant case neither KVO nor

2    Timberline are co-defendants with StreamCast.   However, the question

3    ultimately remains whether production in discovery is sufficient for a

4    reasonable jury to find the document authentic.   Since KVO and

5    Timberline were StreamCast's business partners and their interests are

6    not adverse to StreamCast's, there is no reason to doubt the

7    authenticity of documents they produced.   Thus, a reasonable jury can

8    find Exhibits 16 and 17 to be authentic.

9

10       B.   Hearsay

11       StreamCast also objects to Exhibits 14 through 17 on hearsay

12   grounds.   Hearsay is an out-of-court statement "offered in evidence to

13   prove the truth of the matter asserted."   Fed. R. Evid. 801(c).

14   Hearsay is generally not admissible unless it meets the definition of

15   non-hearsay set forth in Rule 801(d), or falls under an hearsay

16   exception set forth in Rule 803 or 804.   See Fed. R. Evid. 801(d), 803

17   & 804.   For convenience, most of the documents comprising Exhibits 14

18   through 17 can be divided into three categories: (1) emails, including

19   attachments, sent by StreamCast or individual StreamCast agents; (2)

20   emails, including attachments, sent to StreamCast or its agents by

21   third parties, including users and business associates; (3) documents,

22   not attached to emails, that contain business or marketing plans and

23   meeting notes.

24       First, under Rule 801(d)(2)(D), "a statement made by the party's

25   agent or servant concerning a matter within the scope of the agency or

26   employment, made during the existence of the relationship," is non-

27   hearsay.   Fed. R. Evid. 801(d)(2)(D).   Plaintiffs contend that emails

28   sent by StreamCast agents are admissible as vicarious admissions by a

1   party's agents under Rule 801(d)(2)(D).  The rule "requires the

2   proffering party to lay a foundation to show that an otherwise

3   excludable statement relates to a matter within the scope of the

4   agent's employment."  Brenemen v. Kennecott Corp., 799 F.2d 470, 473

5   (9th Cir. 1986).  "When a court is evaluating whether such a

6   foundation has been established, '[t]he contents of the statement

7   shall be considered but are not alone sufficient to establish . . .

8   the agency or employment relationship and scope thereof.'"  Sea-Land

9   Service, Inc. v. Lozen Int'l, LLC, 285 F.3d 808, 821 (9th Cir. 2002)

10  (quoting Fed. R. Evid. 801(d)(2)).  If content created by individuals

11  other than the creator of an email is incorporated into the email, the

12  incorporated content is also admissible non-hearsay under Rule

13  801(d)(2)(B).  Sea-Land, 285 F.3d at 821; see also Fed. R. Evid.

14  801(d)(2)(B) ("a statement of which the party has manifested an

15  adoption" is not hearsay.)

16      In the instant case, a large part of the evidence consists of

17  emails by StreamCast CEO Michael Weiss, chairman Steven Griffin, chief

18  technology officer Darrell Smith, director Bill Kallman, vice

19  president for marketing Trey Bowles, network operations manager Derek

20  Anderson, and software engineer Paul Panetti.  StreamCast admits that

21  these individuals served as its corporate officers or employees during

22  the relevant time period.  Another StreamCast employee, Jody Pace, was

23  identified by Griffin's deposition testimony.  (Fabrizio Decl. Ex. 1

24  at 74.)  Thus, emails sent by these individuals are all admissible

25  non-hearsay under Rule 801(d)(2)(D).  To the extent other content is

26  incorporated into these emails, and to the extent the StreamCast agent

27  expresses approval thereof, the incorporated content is admissible as

28  vicarious adoptions.  See Fed. R. Evid. 801(d)(2)(B).  The record also

1  contains a number of emails from Margaux Schaffer, a graphic design

2  professional.  StreamCast admits that Schaffer performed work for

3  StreamCast during the relevant period, but argues that Schaffer's

4  emails do not fall within the ambit of Rule 801(d)(2)(D) because she

5  was an independent contractor rather than an employee.  However, a

6  statement is admissible under Rule 801(d)(2)(D) so long as it is made

7  by an agent within the scope of agency, regardless of the precise

8  contractual relationship between the agent and the party against whom

9  the evidence is offered.  Fed. R. Evid. 801(d)(2)(D).  The record

10 clearly indicates that Schaffer was an agent of StreamCast.  Weiss

11 included Schaffer in an email he sent to the StreamCast "Team" on the

12 company's business progress; the four other recipients were core

13 employees such as Smith and Griffin.  (Fabrizio Decl. Ex. 14 at 679.)

14 In another email, Weiss directed Schaffer to work on graphic icons for

15 StreamCast software.  (Fabrizio Decl. Ex. 14 at 683.)  Schaffer, in

16 turn, sent several emails to Smith and Weiss with proposed designs and

17 art work for StreamCast.  (See, e.g., Fabrizio Decl. Ex. 14 at 610,

18 612, 614, 660.)  Regardless of her precise contractual status,

19 Schaffer's responsibilities were comparable to that of an in-house

20 graphic designer.  In fact, a PowerPoint presentation sent by Schaffer

21 to Smith described her as StreamCast's art director.  (Fabrizio Decl.

22 Ex. 14 at 620.)  Accordingly, the Court finds that Schaffer to be a

23 StreamCast agent for purposes of Rule 801(d)(2)(D), and that all of

24 her statements are admissible non-hearsay.

25      Lastly, StreamCast admits that info@musiccity.com is one of its

26 corporate email addresses.  All emails sent from that address are thus

27 admissible non-hearsay as admission by the party opponent under Rule

28 801(d)(2).

1    The second category of documentary evidence consists of emails

2 received by StreamCast or its agents.  Plaintiffs have proffered

3 several emails sent to info@musiccity.com by users that discussed

4 their use of StreamCast's Morpheus software to infringe Plaintiffs'

5 copyrights, and sought technical assistance to play back music files

6 downloaded though Morpheus.  StreamCast seeks to exclude these emails

7 as hearsay.  Plaintiffs rejoin that the emails are not hearsay because

8 they are not offered for the truth of the matter stated, such as

9 whether StreamCast was a great service as some users claimed or

10 whether the users experienced technical problems.  Rather, they are

11 offered to establish StreamCast's knowledge and state of mind as to

12 the activities of Morpheus users.  The Court agrees, and finds these

13 emails to be non-hearsay.  Likewise, emails received by StreamCast

14 agents - Weiss, Smith, Griffin, Panetti, Schaffer, Bowles, and

15 Anderson - are all admissible to show knowledge and state of mind,

16 even if the emails were not created by StreamCast agents and thus do

17 not qualify as vicarious admissions under Rule 801(d)(2)(D).

18    Third, Plaintiffs have proffered numerous documents, produced by

19 StreamCast, that appear to be business plans and PowerPoint

20 presentations.  These documents are not attached to emails.

21 StreamCast objects to them on hearsay grounds.  Documents that bear

22 StreamCast's trade names, logos, and trademarks are statements by

23 StreamCast itself, and are admissible as admissions by a party-

24 opponent under Rule 801(d)(2), or alternatively as non-hearsay to show

25 StreamCast's state of mind.  These include, but are not limited to,

26 PowerPoint presentations (See, e.g., Fabrizio Decl. Ex. 14 at 717-39,

27 745-827; Ex. 15 at 1057-72) and business plans (See, e.g., Fabrizio

28 Decl. Ex. 14 at 937-50; Ex. 15 at 1045-56, 1073-1132).  Other

1    documents not bearing StreamCast but were created by StreamCast

2    employees are admissible as vicarious admissions under Rule

3    801(d)(2)(D).  For example, Griffin has in deposition recognized one

4    of the documents as the text of a speech Weiss gave.  (Fabrizio Decl.

5    Ex. 14 at 742-43; Baker Decl. Ex. 5 at 1296-98).  Since Weiss was

6    StreamCast's CEO, any statement he made is admissible under Rule

7    801(d)(2)(D).

8          These documents, which are admissible for the reasons discussed

9    above, form the factual basis for the discussion to follow.

10

11   III. FACTUAL BACKGROUND

12         In mid-2000, StreamCast - then known as MusicCity -  was a

13   company on the ropes.[1]  A fledgling Internet startup, it had yet to

14   find a viable business model.  With no revenue stream, StreamCast was

15   on track to exhaust its funds in early 2001.  (Weiss Decl. at 7;

16   Fabrizio Decl. Ex. 1 ("Griffin Depo.") at 100-01.)  The company

17   initially hoped to create personalized online radio stations, and

18   approached the major music labels to discuss possible licensing deals,

19   but no agreements resulted.  Unable to launch the radio business that

20   was its original raison d'etre, StreamCast had to either find a new

21   business plan or shut down.  Darrell Smith, StreamCast's chief

22   technology officer, proposed developing a software product that would

23   help Internet users multitask.  A typical Internet user kept several

24   specialized software programs open simultaneously in order to access

25   different functions such as chat, email, online news, and music and

26

27   [1]    For consistency and simplicity, the Court will use

28   "StreamCast" to refer to the company for all relevant time
     periods.

1  video playback.  Smith's proposed product, which he called "Morpheus

2  Toolbar," would combine these disparate functions in a single

3  graphical user interface.  Users would no longer have to turn to

4  different software programs when switching from chat to email, for

5  instance; the application will "morph" automatically to suit the

6  user's needs.  Revenue would be generated from advertising displayed

7  in the Morpheus Toolbar interface.  The company would also collect

8  fees for third party services, such as internet telephony, provided

9  through the application.  In October 2000, Smith presented the

10  Morpheus Toolbar proposal to StreamCast's board of directors.  The

11  board authorized the project to go forward, but stipulated that

12  management must secure project funding from new investors.  Potential

13  new investors approached by StreamCast expressed concern about

14  StreamCast's ability to distribute and promote Morpheus Toolbar.

15        To solve the distribution problem, Smith suggested launching a

16  file-sharing network to build up StreamCast's MusicCity brand and

17  create a potential user base for Morpheus Toolbar.  The network would

18  be compatible with the Napster file-sharing network, then among the

19  largest in the world, and be positioned to attract Napster users.

20  Napster had attracted considerable notoriety as a service that enabled

21  computer users to obtain copyrighted material for free through direct

22  peer-to-peer file-sharing.  See A&M Records, Inc. v. Napster, Inc.,

23  239 F.3d 1004 (9th Cir. 2001).  Building the network would not entail

24  significant new expenditures.  StreamCast had already purchased server

25  computers for its stillborn online radio operation.  The servers would

26  be deployed with OpenNap, an open-source, free, and Napster-compatible

27  server application designed to facilitate peer-to-peer file-sharing.

28  StreamCast's OpenNap network functioned in nearly the exact same way

1  as Napster's.  Each user maintained on her client computer a directory

2  of files to be shared.  The OpenNap server extracted the names of

3  those files and compiled them into a search index.  A user could

4  search for a particular file name – perhaps a sound recording – by

5  sending a request to the server-side index.  If the index identified

6  matching files, the server would communicate the Internet address of

7  the file host to the requesting user, who could then download the

8  desired file directly from the host.  (Fabrizio Ex. 2 ("Smith Dep.")

9  at 132-37.)  Importantly, users could use their existing Napster or

10  other Napster-compatible client software to connect to the MusicCity

11  servers.  StreamCast did not have to develop new client software

12  programs, and the users did not have to install them.  Because

13  Napster's file-sharing network was large, Napster users constituted an

14  attractive audience for the Morpheus Toolbar.  This was particularly

15  so in light of Napster's legal troubles.  On July 26, 2000, a federal

16  district court entered a preliminary injunction against Napster for

17  contributory copyright infringement; although the injunction was

18  temporarily stayed pending appeal, the legal uncertainty surrounding

19  Napster meant that its users were ripe for the picking by alternative

20  file-sharing networks.  See A&M Records, 239 F.3d at 1011.

21      StreamCast's file-sharing network was launched on January 3,

22  2001, under the MusicCity brand and using OpenNap technology.  To

23  attract users to its servers, StreamCast agents went into online

24  chatrooms to spread the word that a new set of OpenNap servers were

25  available.[2]  (Smith Depo. Ex. 2 at 237-38.)  StreamCast was also listed

26  _____

27  [2]   StreamCast's two primary witnesses, current CEO Michael
   Weiss and board member William Kallman, have testified that they

28  were not aware of any such promotional efforts in online
   chatrooms.  However, there is no evidence that specifically

on Napigator, a third-party online directory of OpenNap-compatible servers. Soon StreamCast was successful beyond its imagination. CEO Michael Weiss detailed the company's rapid progress in an upbeat email on January 5, 2001:

> We went online on Wednesday morning (1/3/01) with 4 servers that could be accessed through the napigator.com website. By noon we had 315 smultaneous [sic] users sharing 55,000 MP3 files within the network. By 2:00 pm the following day (Thursday), we added a 5th server and our traffic jumped to 639 simultaneous users sharing 175,000 MP3 files. We then brought 5 more servers on line and had 1501 simultaneous users sharing 316,000 MP3 files by Thursday evening. This would have represented approximately 12,000 unique users for Thursday.
>
> : . .
>
> We have put this network in place so that when Napster pulls the plug on their free service (or if the Court orders them to shut down prior to that), we will be positioned to capture the flood of their 32 million users that will be actively looking for an alternative. Napster might easily loose [sic] over half of their user base and we could be in a position to pick up a majority of them. It is not inconceivable that our user numbers could jump 1000%+...and this could very easily happen within the next six days.

<hr>

contradicts Smith's testimony regarding promotion in chatrooms. Defendant also claims that Smith's testimony is refuted by Griffin's denial that StreamCast deployed a chatroom promotion strategy for the launch of Morpheus/Fastrack in April 2001. (Baker Decl. Ex. 5 at 1285-86.) Defendant appears to have confused Morpheus/Fastrack with OpenNap.

> It was always our intent to use our alternative Napster Network (which we are operating under the MusicCity.com brand) to be able to capture email addresses of our initial target market so we could promote our StreamCast Morpheus interface to them and quickly capture a significant user base way ahead of our projections and without counting on third party companies.
>
> Since we have experienced this dramatic growth within just a few days, I have directed our staff to quickly deploy a new MusicCity.com website that focuses on our OpenNap Alternative Network. . . . Once the site is up, we have a plan to give us some quick notoriety in the media (and at the expense of Napster Inc.)

(Fabrizio Decl. Ex. 14 at 677-78.)  On January 18, 2001, Weiss further announced by email:

> We just hit a new all time high with our 10 servers:
>
> 72,283 users sharing 15,006,322 files.
>
> The chat rooms went wild once we crossed the 70,000 user plateau. We have commandeered nearly 35% of all the alternative Napster users.

(Fabrizio Decl. Ex. 14 at 681.)

StreamCast began to develop promotional materials that explicitly presented MusicCity as an alternative to Napster.  Beset by litigation, Napster was apparently developing plans to license music from record labels and charging users accordingly.  StreamCast positioned itself as a Napster alternative where users could continue to download copyrighted music for free.  In an email dated January 6, 2001, art director Margaux Schaffer suggested an advertisement that

14

1   touted MusicCity as "[t]he fastest, most reliable alternative service

2   to Napster. . . and it's FREE." (Fabrizio Decl. Ex. 14 at 611.) It

3   then asked: "Napster Inc. has announced that it will soon begin

4   charging you a fee.  That's if the courts don't order it shut down

5   first.  What will you do to get around it?"  (Id.)  The record does

6   not indicate whether this particular advertisement was ever publicly

7   distributed.

8        It is undisputed that StreamCast did deploy online banner

9   advertisements, featuring the MusicCity logo, that asked: "When the

10  lights went off at Napster . . . where did the users go?"  (Griffin

11  Depo. at 105; see also Smith Depo. at 138; Fabrizio Decl. Ex. 14 at

12  613.)  StreamCast ran the ad on the third party client software that

13  were used to access the MusicCity OpenNap servers, and timed the ads

14  to coincide with technical problems at Napster.  (Smith Depo. at 239.)

15  As Smith testified:

16       A:   Because every time you had a disgruntled Napster user, by

17            running the advertising and the way the advertising was

18            spoofing and poking jest at Napster, it was basically

19            telling the users, hey, you're going to get a better

20            experience if you come to MusicCity.com.

21       Q:   And what was the objective of StreamCast's marketing and

22            promotional efforts?

23       A:   At the time, it was to increase the number of users by

24            increasing the amount of file sharing, because the more

25            files that were physically available, the more users would

26            come.

27  (Smith Depo. at 239-40.)  Then-chairman Steve Griffin also explained

28  that StreamCast's objective was to "increase the number of users by

15

1   increasing the amount of file sharing, because the more files that

2   were easily available, the more users would come." (Griffin Depo. at

3   239-40.)

4       A draft copy prepared for use on the MusicCity website, which was

5   attached to an email sent by Smith on January 9, 2001, sounded a

6   similar theme. It stated that "[t]he independent servers, those that

7   are not affiliated with Napster Inc. will remain open and free

8   regardless of any corporate decision by Napster Inc. to charge a

9   monthly fee or any court decision that causes Napster Inc. to be shut

10  down." (Fabrizio Decl. Ex. 14 at 850.) The email also stated,

11  "MusicCity.com operates the largest number of these non-Napster, Inc.

12  servers and you can click here to access them." (Fabrizio Decl. Ex.

13  14 at 851.) "You can help increase the number of files for sharing by

14  sending the MusicCity.com OpenNap link to your entire contact list."

15  (Fabrizio Decl. Ex. 14 at 852.) Likewise, StreamCast positioned

16  itself as a Napster alternative in materials developed for potential

17  investors and business partners. In an email dated February 17, 2001,

18  Schaffer sent Smith presentation slides that cast MusicCity as "The

19  #1 Alternative Network to Napster." The presentation boasted that

20  MusicCity had a "bigger selection" of files than Napster: over three

21  million files available at all times, compared with only one and half

22  million at Napster. (Fabrizio Decl. Ex. 14 at 614, 623, 627, 633).

23      StreamCast officials, including Smith and then-chairman Steve

24  Griffin, were well aware that the Napster network was heavily used for

25  downloading copies of copyrighted music recordings, and that OpenNap

26  would be no different. (Griffin Depo. at 102; Smith Depo. at 245-46.)

27  In an email dated January 11, 2002, Smith explained: "The goal is to

28  get in trouble with the law and get sued. It's the best way to get in

1 | the new[s]." (Fabrizio Decl. Ex. 14 at 864.) StreamCast was not in

2 | serious legal trouble at this point, but Napster was. StreamCast

3 | hoped that if Napster was shut down or forced to filter its network to

4 | eliminate copyrighted music by court order, frustrated Napster users

5 | would turn to StreamCast. (Griffin Depo. at 103-105; Smith Depo. at

6 | 145.) Although StreamCast's OpenNap servers were initially designed

7 | to search only files in the MP3 format, the search function was

8 | expanded "to entice Napster users." (Smith Depo. at 244.) At the

9 | same time, StreamCast did not have the capacity to meet the expected

10 | influx of Napster users because its systems were already strained to

11 | the limit. (Smith Depo. at 143.) To meet the expected influx of

12 | Naspter users, StreamCast raised money from its venture capital

13 | backers to purchase additional server hardware.[3] (Griffin Depo. at

14 | 100-01.)

15 |     Although its user base grew rapidly, StreamCast did not intend to

16 | keep users on the OpenNap network for long. StreamCast did not

17 | receive any revenue from its OpenNap servers. Users accessed

18 | StreamCast's servers using such third party clients as Napster or

19 | Napigator. Users were not asked to pay StreamCast for access to its

20 | servers. Neither did StreamCast monetize the traffic by selling

21 | advertisements, because the servers were accessed through third party

22 | client software. StreamCast's objective was to promote the MusicCity

23 | ――――――――――――――――――

24 | [3]     StreamCast claims that this fact is contradicted by the
testimony of director Bill Kallman, who represented the venture
25 | capital investors on the board directors. Kallman stated that "I
don't recall ever-instructing Mr. Smith to purchase additional
26 | servers. . . . In fact, . . . I didn't hire him, the CEO hired
him, and he worked under the supervision of the CEO." (Kallman
27 | Decl. ¶ 33.) Fairly read, Kallman's testimony only reflected his
lack of familiarity with operatinoal details, and does not
28 | contradict Griffin's deposition testimony.

brand and then migrate those users to the its proprietary Morpheus client, which would contain revenue-generating advertising space.  As explained in presentation slides Schaffer emailed to Smith on February 17, 2001, StreamCast intended to eventually monetize its rapidly growing user base by moving to a revenue structure modeled on the broadcast radio business.  (Fabrizio Decl. Ex. 14 at 638-43.)  Music would continue to be free to users, but StreamCast would compensate copyright holders through advertising revenue, and implement necessary copyright protection technology.  "Appropriate rights holders will be justly compensated."  (Id.)  StreamCast also intended to eventually move beyond music.  "Technology will be marketed and licensed to industries beyond music," including media, communications, financial markets, and healthcare.  (Fabrizio Decl. Ex. 14 at 655.)  However, nothing in the record indicates that StreamCast ever implemented active measures to compensate copyright holders whose works were infringed using Morpheus technology.

StreamCast then abandoned the Morpheus Toolbar application Smith originally envisioned in 2000.  (Weiss Decl. at 19.)  The new Morpheus would be a peer-to-peer file-sharing application that could be an adequate replacement for OpenNap.  In early 2001, Smith contacted Consumer Empowerment, BV, a Dutch firm that held that rights to FastTrack, a peer-to-peer file-sharing software program.  FastTrack was the technology behind the popular file-sharing client Kazaa. Unlike Napster or OpenNap, FastTrack's search function did not depend on a centralized server-side index.  Instead, a search request simply proceeded from user to user until matching files are found.  In other words, the use of FastTrack would render MusicCity's central search index unnecessary; search, storage, and transfer of files would all

take place on users' computers.  In addition to FastTrack's pre-existing file-sharing features, Smith wanted Consumer Empowerment to make certain improvements.  Smith sought to add a chat function as well as "a product/artist search" feature.  As he explained in an email, "[t]he search functionality would allow users to find information about artist and mp3 related products.  We currently maintain a database with information on 2 million songs including album cover art."  (Fabrizio Decl. Ex. 14 at 601.)  In addition, Smith wanted to remove a pre-existing feature that filtered out audio files compressed at bitrates above 128 kilobytes per second.[4]  Consumer Empowerment explained the bitrate limitation was implemented "as a means to negotiate with the . . . record companies."  Smith responded, "[i]n the US market the RIAA feels the same about all MP3s, it doesn't matter to them what the bitrate is."[5]  (Fabrizio Decl. Ex. 14 at 605.)

Prior to reaching a licensing agreement with Consumer Empowerment, Griffin searched for Garth Brooks songs using FastTrack in order to assess the system's capabilities.  (Griffin Depo. at 36-37.)  As Morpheus was prepared for launch, StreamCast continued to pay close attention to the availability of music and movies on its network.  In an email dated April 21, 2001, Griffin complained to Weiss: "Mike, I downloaded bearshare[6] to compare, and they are much larger, I typed in garth brooks and got 2700 songs, on Morpheus I got 60."  (Fabrizio Decl. Ex. 14 at 692.)  In an email entitled "beta

---

[4]     The higher the bit rate, the higher the audio quality of the digital sound file.

[5]     "RIAA" refers to the Record Industry Association of America.

[6]     BearShare is a competing peer-to-peer network.

testing" and dated April 15, 2001, Schaffer wrote to Smith that "I think our biggest problem is going to be qualifying content . . . a lot of these programs are missing stuff; I am on my third copy of sonic foundry's ACID :-P." (Fabrizio Decl. Ex. 14 at 659.) After discussing several technical problems with Morpheus, Scaheffer again stated "I seem to be having problems finding music content, a lot of non results even on stuff like Elton John, but I guess that our network should make some differance [sic] since we have greater numbers." (Id.)

StreamCast's expectation that Morpheus would be used for piracy is further evidenced by screenshots of the Morpheus interface Schaffer emailed on July 9, 2001. The screenshot, which appears to be an image capture of the Morpheus interface during testing, demonstrated a search for music by the artist Sting, with a listing of Sting recordings available for download. (Fabrizio Decl. Ex. 14 at 660, 665.) In another email sent approximately five hours later, Schaffer wrote "here is an example of keeping the examples but covering our asses," and attached a screenshot demonstrating a search but with the artist information blurred out. (Fabrizio Decl. Ex. 14 at 672-73.) Additionally, Streamcast tested Morpheus by downloading music by Britney Spears. (Fabrizio Decl. Ex. 14 at 704.)

On April 21, 2001, StreamCast shut the OpenNap MusicCity network and began migrating users to Morpheus. (Fabrizio Decl. Ex. 14 at 699.) Perhaps not coincidentally, StreamCast had been recently warned by its counsel that the OpenNap service was now "unbelievably risky" in light of recent developments in Napster litigation.[7] (Fabrizio

---

[7] The warning was stated in an email from attorney Jeff Bridges to Mike Weiss and Steve Griffin.

Decl. Ex. 16 at 1138.)  StreamCast had also received an infringement notice from the RIAA.  (Weiss Decl. at 19.)  Shortly after, the revised MusicCity.com website that was launched along with Morpheus advised users that it was illegal to trade copyrighted material without permission from the copyright owner.  (Weiss Decl. at 19; see also Weiss Decl. Ex. 25.)  StreamCast's Terms of Service agreements with its users also demanded "you must agree that you will not use MusicCity Networks to infringe the intellectual property or other rights of others in any way."  (Weiss Decl. Ex. 28.)  But aside from admonishments to users, StreamCast did not believe it had any responsibility to prevent the use of its software for infringement. StreamCast's view was that copyright owners were solely responsible for protecting their content.  A draft copy for MusicCity.com created on April 24, 2001, contained the following question and answer:

Q:    How can your service protect copyrights?

A:    It is incumbent upon content owners to protect their
      copyrighted works by deploying digital media rights
      management software prior to releasing their works in a
      digital format.  Once protected, our services does nothing
      to subvert that protection, in fact we embrace it and
      encourage it. . . .  We fully support the concept of
      copyright and vow to work with content owners to provide
      them with a secure way to distribute their digital media
      trough our network."

(Weiss Decl. Ex. 34 at 209.)

     As reflected in emails sent to StreamCast from users, StreamCast knew that the new Morpheus software continued to be used for copyright

infringement.  Many users complimented StreamCast for offering an
alternative to Napster.  For example, one user wrote:

> Just wanted to tell you how much I love your site.  I used
> to use Napster all the time, and when they began battling in
> court I decided to look for a new place to look for all the
> music I love.  I wanted to tell you that I have never had a
> problem finding any songs I want.

(Fabrizio Decl. Ex. 14 at 553.)  Other emails reported technical
problems. StreamCast sometimes offered technical assistance to ensure
that Morpheus users could enjoy the music and movies they downloaded.
For example, in July and August 2001, StreamCast received several
emails from users reporting inability to playback downloaded videos,
including the movies Tomb Raider, The Blair Witch Project, Shrek, and
The Mummy's Return.  (Fabrizio Decl. Ex. 14 at 564-68.)  In each
instance, StreamCast advised the user to install the relevant third
party playback software plugins.  (Id.)  Still other emails sought
advice on finding or sharing content, and StreamCast's response was
telling.  On July 12, 2002, a user complained about the paucity of
music from artists Elvis, Muddy Waters and the Buddy Guy.  StreamCast
replied: "We do not control what users put on the site.  (policy
section).  Maybe you should load some up."  (Fabrizio Ex. 14 at 556-
57) (emphasis added).  In an email dated July 19, 2001, a user
inquired how he could copy and give to a friend a song by Tupac Shakur
from the Morpheus interface; StreamCast replied that he should attach
the music file to an email.  (Fabrizio Decl. Ex. 14 at 571.)

By the end of 2001, StreamCast had been transformed from a
floundering startup with no revenue to a growing company with
approximately $1.8 million in annual revenue.  (Griffin Depo. at 90.)

1  Nearly all of StreamCast's 2001 revenue came from advertising.  (Id.)

2  The company sold advertising space on the Morpheus interface, on the

3  MusicCity.com website, as well as on pop-up windows accompanying the

4  Morpheus software.  (Fabrizio Ex. 1 (Griffin Dep.) at 90.)  Weiss

5  explained in a presentation he wrote in May 2001:

6       A big bulk of our revenue comes from advertising – at a time

7       that advertising is a four letter word to many in the

8       investment community – to us those four letters are CASH.

9       And we can do so where others have failed – even in this

10      highly depressed ad environment – because we are leveraging

11      our proprietary Peer-to-peer technology to achieve an

12      unprecedented low cost of goods.

13  (Weiss Decl. Ex. 11 at 129.)  Of course, the flow of advertising

14  revenue depended on StreamCast's ability to attract a large number of

15  users, which in turn depended on the amount of music available in the

16  Morpheus network.  According to a PowerPoint presentation produced by

17  StreamCast, among the greatest advantages of StreamCast's business

18  model was that it had "[n]o product costs to acquire music" and an

19  "[a]bility to get all the music."  (Fabrizio Decl. Ex. 15 at 1066.)

20  Indeed, in a October 2001 marketing plan to pitch StreamCast's

21  advertising services to a video game company, which StreamCast

22  produced in discovery, the availability of music was identified as a

23  competitive advantage over rival MP3.com:

24       Morpheus contains thousands of music and entertainment files

25       while MP3.com's roster of offerings is limited.  For

26       example, a search on Morpheus resulted in pages of Madonna

27       tracks, while the same search on MP3.com resulted in only

28       two Madonna tracks.

(Fabrizio Ex. 15 at 1097.)

While its users downloaded copyrighted works on a massive scale, StreamCast acted to thwart copyright enforcement efforts.  In an email dated March 7, 2001, Smith instructed StreamCast's network operations manager to ban from OpenNaps "hackers for the RIAA and Metalica [sic]," [8] who were presumably engaged in copyright enforcement efforts. (Fabrizio Decl. Ex. 14 at 867.)  In an email dated May 9, 2001, Weiss alerted Smith and Griffin to Media Enforcer LLC, a company that marketed software to help copyright owners track infringement on file-sharing networks.  (Fabrizio Decl. Ex. 14 at 693-94.)  Media Enforcer was discussed in an executive meeting between StreamCast and Consumer Empowerment at the Loews Hotel in Santa Monica.  Smith expressed the view that FastTrack activities were being tracked by Media Enforcer, which could possibly lead to a cease and desist letter.  (Griffin Depo. at 108.)   Weiss was agitated by the thought that Media Enforcer was tracking Morpheus users and wanted to know what could be done to stop it.  (Griffin Depo. at 109.)  In June, Smith purchased a copy of the software program Media Enforcer Professional.  (Fabrizio Decl. Ex. 14 at 706.)  He then provided the registration code to Consumer Empowerment engineers so they could figure out how to block Media Enforcer from searching the FastTrack network. [9]  After Consumer Empowerment successfully blocked Media Enforcer, Smith sent a

---

[8]   Metallica is a well-known heavy metal music act.

[9]   It should be noted that Kazaa engineers cracked Media Enforcer before Smith provided the registration code, so the code Smith gave turned out to be unnecessary.  (Fabrizio Ex. 14 at 706.)

1  congratulatory email stating "Good job" and "that's good, no more

2  MediaEnforcer." (Fabrizio Decl. Ex. 14 at 925.)[10]

3       Smith has also testified that he believed it was technologically

4  feasible to institute a filter that would prevent copyrighted content

5  from being traded in the OpenNap and Morpheus/FastTrack networks. He

6  presented his ideas to Kallman and Weiss, but was advised "that's not

7  a good thing to place into the software in case we were told to

8  actually use it." (Smith Depo. at 265.) Kallman and Weiss feared

9  that applying filtering technology would drive users to competing

10  peer-to-peer networks. (Smith Depo. at 266.) Griffin has confirmed

11  this account. (Griffin Depo. at 112.) Kallman denies that he ever

12  heard such a presentation from Smith or gave instructions to not

13  implement copyright filtering technology. (Kallman Decl. at 12-13.)

14       Morpheus/FastTrack contained filters that permitted users to

15  block pornographic files and viruses on the basis of metadata, or

16  textual tags attached to each file. File name and file extension are

17  both examples of metadata. The filters operated by screening out

18  files with "sex" in the file name as likely pornographic content or

19  "exe" in the file extension, which often indicates that the file

20  contains a virus. The filters were implemented by Consumer

21  Empowerment and came packaged with FastTrack. Smith has testified

22  that it was technologically feasible to use such metadata filters to

23  screen out copyrighted files. Smith has testified that by 2003, the

24  ─────────────────────

25  [10]    StreamCast does not dispute that it purchased a copy of Media Enforcer and forwarded it to Consumer Empowerment. (Weiss Decl. at 26.) However, Weiss asserts that "StreamCast did not

26  participate in any action against any copyright monitoring or enforcing company." (Id.) This conclusory statement is

27  insufficient to create a genuine dispute as to StreamCast's cooperation with Consumer Empowerment with regard to Media

28  Enforcer.

code base of Morpheus 3.0 had the capability to filter out copyrighted files on the basis of metadata, although the filter would also block non-copyright-protected files with similar metadata.  However, this feature was not implemented in the released software.

In addition to metadata filtering, in recent years start-up companies such as Audio Magic and SnoCap have offered new "acoustic fingerprinting" technology, which they claim can filter copyrighted works in peer-to-peer networks not just on the basis of metadata, but also by examining the contents of a file.  StreamCast, however, disputes the effectiveness of acoustic fingerprinting.

StreamCast's business, particularly its advertising revenues, continued to grow rapidly into 2002.  StreamCast recorded $3,312,664 in revenue for 2002, of which $2,672,517 was attributed to advertising.  The remainder came from a new software distribution business.  Essentially, StreamCast was compensated by third party software developers for bundling Morpheus with their software, such that a user received a copy of the third party program with each download of Morpheus.  Also in 2002, StreamCast abandoned FastTrack and switched its file-sharing platform to Gnutella, an open-source program.

In 2003, StreamCast recorded $2,281,226 in revenue, of which only $439,706 came from advertising.  Also that year, StreamCast left the Gnutella platform and adopted a new file-sharing platform known as NeoNet.  In 2004, StreamCast had $2,788,954 in revenue, of which $725,339 came from advertising.  The bulk of the remainder came from software bundling.  In 2004, StreamCast also began selling Morpheus Ultra, a premium version of Morpheus that users had to buy rather than download for free.  (Weiss Decl. Ex. 15.)  In mid 2005, StreamCast

discontinued the software bundling service.   Today about half of
StreamCast's revenues come from sales of Morpheus Ultra, while most of
the remainder comes from advertising.

## IV.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure Rule 56(c) requires summary
judgment for the moving party when the evidence, viewed in the light
most favorable to the nonmoving party, shows that there is no genuine
issue as to any material fact, and that the moving party is entitled
to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Tarin v.
County of Los Angeles, 123 F.3d 1259, 1263 (9th Cir. 1997).

The moving party bears the initial burden of establishing the
absence of a genuine issue of material fact.  See Celotex Corp. v.
Catrett, 477 U.S. 317, 323-24 (1986).  That burden may be met by
"'showing' – that is, pointing out to the district court – that there
is an absence of evidence to support the nonmoving party's case."  Id.
at 325.  Once the moving party has met its initial burden, Rule 56(e)
requires the nonmoving party to go beyond the pleadings and identify
specific facts that show a genuine issue for trial.  See id. at 323-
34; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A
scintilla of evidence or evidence that is merely colorable or not
significantly probative does not present a genuine issue of material
fact."  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir.
2000).  Only genuine disputes – where the evidence is such that a
reasonable jury could return a verdict for the nonmoving party – over
facts that might affect the outcome of the suit under the governing
law will properly preclude the entry of summary judgment.  See
Anderson, 477 U.S. at 248.

27

When the moving party bears the burden of proof at trial – as is the case here – the moving party must present evidence which, if uncontroverted, would entitle it to prevail. UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. Cir. 1994). Once the moving party has established a prima facie case, the non-moving party must produce evidence to the contrary in order to survive summary judgment. Id.

## V.   SECONDARY LIABILITY

### A.   The Inducement Doctrine

Plaintiffs have moved for summary judgment on StreamCast's liability for the infringement committed by its users on the basis of the inducement doctrine set forth by the Supreme Court in Grokster. As the Supreme Court held, "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." Grokster, 125 S. Ct. at 2770. The Supreme Court further explained,

> [M]ere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor [of the device] to liability. Nor would ordinary acts incident to product distribution, such as offering customers technical support or product updates, support liability in themselves. The inducement rule, instead, premises liability on purposeful, culpable expression and conduct, and thus does nothing to compromise legitimate commerce or discourage innovation having a lawful promise.

1   *Id.* at 2780.  Importantly, liability may attach even if the defendant

2   does not induce specific acts of infringement.  *Id.* at 2782 n.13.

3       An unlawful objective to promote infringement can be shown by a

4   variety of means.  "The classic instance of inducement is by

5   advertisement or solicitation that broadcasts a message designed to

6   stimulate others to commit violations."  *Id.* at 2780.  However,

7   showing that the defendant sent out such a message is "not [the]

8   exclusive way of" demonstrating inducment.  *Id.*  With respect to

9   StreamCast, the Supreme Court highlighted three facts from which a

10  reasonable factfinder could infer an intent to foster infringement.

11  First, some internal StreamCast communications and advertising designs

12  expressed an intent to target Napster users, a community well-known

13  for copyright infringement.  Although it was not known whether some of

14  the advertising designs were actually communicated to the public,

15  "whether the messages were communicated is not to the point on this

16  record."  *Id.* at 2781.  "The function of the message in the theory of

17  inducement is to prove by a defendant's own statements that his

18  unlawful purpose disqualifies him from claiming protection."  *Id.*

19  Second, StreamCast did not attempt to develop filtering tools or other

20  means of diminishing the use of its products for infringement.

21  Although this fact alone would be insufficient to support liability,

22  viewed in conjunction with other evidence it underscored StreamCast's

23  unlawful objective.  *Id.* at 2781 n. 12.  Third, StreamCast's business

24  model depended on high-volume use of its software, which was

25  overwhelmingly infringing.  *Id.* at 2781-82.  Again, this evidence

26  would not alone justify the imposition of liability, but it supported

27  an inference of unlawful intent when viewed in context with other

28  evidence in the record.  *Id.*

StreamCast argues that a defendant could be found liable for
secondary infringement only if it: (1) for the purpose of inducing
infringement, (2) took actions beyond distributing infringement-
enabling technology, and (3) which actually resulted in specific
instances of infringement.  (Opp'n at 15.)  In StreamCast's view, even
if it distributed peer-to-peer software with the intent for it to be
used for infringement, liability does not attach unless it took
further actions, such as offering instructions on infringing use, that
actually caused specific acts of infringement.  Much of StreamCast's
brief is devoted to arguing that Plaintiffs failed in proving the
second and third elements of its proposed test.  However, StreamCast's
legal theory is plainly contrary to the Supreme Court's holding in
Grokster.  As the Supreme Court explained,

> It is not only that encouraging a particular consumer to
> infringe a copyright can give rise to secondary liability
> for the infringement that results.  Inducement liability
> goes beyond that, and the distribution of a product can
> itself give rise to liability where evidence shows that the
> distributor intended and encouraged the product to be used
> to infringe.  In such a case, the culpable conduct is not
> merely the encouragement of infringement but also the
> distribution of the tool intended for infringing use.

125 S. Ct. at 2782 n. 13.  Thus, Plaintiffs need not prove that
StreamCast undertook specific actions, beyond product distribution,
that caused specific acts of infringement.  Instead, Plaintiffs need
prove only that StreamCast distributed the product with the intent to
encourage infringement.  Since there is no dispute that StreamCast did
distribute an infringement-enabling technology, the inquiry focuses on

the defendant's intent, which can be shown by evidence of the
defendant's expression or conduct.  "If liability for inducing
infringement is ultimately found, it will not be on the basis of
presuming or imputing fault, but from inferring a patently illegal
objective from statements and actions showing what that objective
[is]."  Id. at 2782.

In the record before the Court, evidence of StreamCast's unlawful
intent is overwhelming.


B.   StreamCast's Software Was Used Overwhelmingly for
     Infringement

Plaintiffs have presented studies showing that StreamCast
products facilitated massive infringement of their copyrighted
content.[11]  (See Olkin Decl.; Hausman Decl.)  Plaintiffs' expert
witness Dr. Ingram Olkin is a professor of statistics at Stanford
University.  He devised a random sampling procedure in which words
were randomly selected from the American Heritage Electronic
Dictionary and then used to search for files using Morpheus software.
If a search results in a list of file names, a random number generator
was used to choose a file for downloading.  The search procedure was
implemented in a study supervised by Charles Hausman, an anti-piracy
executive at the Motion Picture Association of America.  The study
showed that 87.33% of the files offered for distribution on the
Morpheus network were infringing or highly likely to be infringing.
The randomly selected files were downloaded, and then uploaded to

---

[11]   StreamCast does not dispute Plaintiffs' ownership of the
copyrighted works identified in the pleadings and the Rule 26
disclosures.

determine the percentage of file download requests from Morpheus users that were aimed at the infringing files.  Almost 97% of the files actually requested for downloading were infringing or highly likely to be infringing.  While infringing use by third parties is not by itself evidence of StreamCast's intent, the staggering scale of infringement makes it more likely that StreamCast condoned illegal use, and provides the backdrop against which all of StreamCast's actions must be assessed.

The only evidence StreamCast offers to rebut Plaintiffs' studies is a declaration from StreamCast counsel Wendy Goodkin, who testfied that she was able to locate some public domain content, such as the Declaration of Independence, using the Morpheus software.  However, Goodkin did not use a random sampling procedure.  Her declaration says nothing about the percentage of files available on the network that are infringing.  It follows that Plainitffs' showing of massive infringement on StreamCast's network is undisputed.


C.   StreamCast's Targeting of Napster Users

StreamCast staved off closure at the start of 2001 by launching its OpenNap/MusicCity network to attract Napster users to is servers.  As the Supreme Court has noted, StreamCast's courting of the Napster community, which was notorious for copyright infringement, indicated an intent to foster infringement.  Grokster, 125 S. Ct. at 2779.  StreamCast now insists that it targeted the Napster community because it wanted to find a way to distribute Morpheus Toolbar, and Napster users represented a technology-savvy audience that any software company would want as a customer base.  However, uncontroverted evidence shows that StreamCast purposefully targeted Napster users,

32

not merely to market to them, but to convert them into StreamCast

users by offering them the same file-sharing service that Napster had

itself offered.  Michael Weiss, StreamCast's CEO, himself stated in an

email from early 2001 that "it was always our intent to use [OpenNap]

to be able to capture email addresses of our initial target market so

that we could promote our StreamCast Morpheus interface to them."

(Fabrizio Ex. 14 at 678.)

StreamCast selected the OpenNap precisely because it was a

Napster-compatible file-sharing application.  Moreover, in the early

days of OpenNap, StreamCast measured its progress by comparing itself

to Napster and by monitoring the amount of files available for

download in the MusicCity network, many if not most of which were

copyrighted works.  StreamCast also sent its agents into Internet

chatrooms to encourage Napster users to migrate to MusicCity, and ran

advertisements promoting itself as an alternative to Napster.

StreamCast's internal documents demonstrated its intent to exploit

Napster's legal problems by enticing users to MusicCity in the event

that Napster was forced to shut down or filter out copyrighted files

by court order.  StreamCast even ran online banner advertisements that

stated: "When the lights went off at Napster . . . where did the users

go?"  StreamCast rejoins that the banner advertisement merely promoted

the use of its products, and did not expressly tell users to infringe.

But that is besides the point.  Clearly, StreamCast sought to offer

the same exact service Napster did to the same group of users, even

after a federal court had entered a preliminary injunction against

Napster for secondary infringement.  StreamCast's current position

that it merely wanted to market Morpheus Toolbar to a desirable

demographic does not controvert the fact that StreamCast chose a means

1  – the establishment and promotion of a Napster-compatible file-sharing
2  service to a community known for infringement – that manifested an
3  intent to encourage copyright infringement.  Such intent was also
4  expressed in an email from CEO Weiss; he started a survey finding that
5  70% of Napster users would defect if Napster asked them to pay for
6  music, and that those users were precisely the ones that StreamCast
7  targeted for acquisition.  (Fabrizio Decl. Ex. 17 at 1373.)

8       Notwthstanding the fact that it actively marketed
9  OpenNap/MusicCity to Napster users, StreamCast argues that it "fell
10 upon these users by accident," and that Napster users discovered and
11 migrated to MusicCity on their own.  It is possible that StreamCast's
12 marketing efforts were wholly ineffective and its user base grew
13 primarily by word of mouth.  Even if the Court assumes that to be
14 true, StreamCast's promotional efforts, internal communications,
15 advertising designs, and actual advertisements constitute clear
16 expressions of its unlawful intent.

17

18      D.   StreamCast's Assistance to Infringing Users

19      It is undisputed that StreamCast provided users with technical
20 assistance for playback of copyrighted content.  The files that users
21 reported having trouble playing back included such popular copyrighted
22 content as Seinfeld, the Matrix, Tomb Raider, and Shrek.  StreamCast
23 argues that the evidence is immaterial because the technical
24 assistance concerned the use of third party software such as
25 Microsoft's Windows Media Player, not Morpheus.  However, those users
26 sought assistance from StreamCast because the music and movies they
27 wanted to play back were downloaded from OpenNap/MusicCity or
28 Morpheus.  StreamCast's incentive to help is obvious: if users could

not enjoy the files they downloaded through Morpheus, they would be less likely to use Morpheus in the future. It is not surprising that, in one instance, StreamCast even suggested to a user that he upload copyrighted content for sharing.[12] While knowledge of infringing use per se cannot give rise to secondary liability, by providing technical assistance to help users enjoy copyrighted content they illegally downloaded, StreamCast demonstrated an intent to encourage use of its technology for infringement.

### E. StreamCast Ensured Its Technology Had Infringing Capabilities

Infringing use was undisputably on StreamCast's mind when it developed Morpheus; indeed, StreamCast took steps to ensure that the technology it deployed would be capable of infringing use. Before deciding to license FastTrack technology for Morpheus, StreamCast chairman Griffin evaluated FastTrack by searching for Garth Brooks songs on the FastTrack network. While Morpheus was in beta testing, StreamCast employees identified the insufficient quantity of popular copyrighted content on the network as an important problem. Griffin continued to focus on the availability of Garth Brooks songs, while art director Margauz Schaffer reported difficulties finding music from Elton John. (Fabrizio Decl. Ex. 14 at 659, 692.) Software engineer Panetti, for his part, tested the system by downloading tracks by Britney Spears. (Fabrizio Decl. Ex. 14 at 704.) As an example of the Morpheus interface's capabilities, StreamCast also created screenshots

---

[12] The user complained about the paucity of music from Elvis and Muddy Waters. StreamCast replied: "We do not control what users put on the site. (policy section). Maybe you should load some up." (Fabrizio Ex. 14 at 556-57.)

1   of a search for music by Sting.  (Fabrizio Decl. Ex. 14 at 660.)

2   StreamCast would not have evaluated Morpheus by its infringing

3   capabilities if it did not intend widespread infringing use.[13]

4       When StreamCast negotiated licensing FastTrack from Consumer

5   Empowerment to replace the OpenNap architecture, Smith told Consumer

6   Empowerment that StreamCast maintained a database of two million songs

7   and wanted to enable users to conduct a "product/artist" search.

8   (Fabrizio Decl. Ex. 14 at 601.)  It is not clear whether that proposal

9   was implemented, but it is undisputed that the Morpheus interface also

10  contains a search category for "Top 40" songs.  "Top 40" is a term

11  typically used to refer to the best-selling or most frequently

12  broadcast pop music songs at a given time.[14]  Such songs are almost

13  invariably copyrighted.  StreamCast explains that Morpheus software

14  does not itself identify particular files as Top 40 content.  Rather,

15  the Top 40 feature enables a user to search for files that other users

16  have designated as Top 40 content.  Even though StreamCast's peer-to-

17  peer architecture gives users responsibility for categorizing content,

18  the fact remains that StreamCast implemented a feature that made it

19  easier for users to share copyrighted content.  The inference of

20  intent to promote infringement is particularly forceful when

21  considered alongside the fact that StreamCast tested the system by

22  searching for infringing content.

---

23  [13]   Plaintiffs have also offered deposition testimony from Smith

24  stating that StreamCast board member Kallman seeded the OpenNap
    network with copyrighted content.  However, Kallman has flatly

25  denied uploading such content in his own deposition testimony.
    The Court, of course, must resolve this dispute fact in favor of

26  StreamCast at this stage of the proceeding.

27  [14]

28     See "Top 40," Wikipedia, http://en.wikipedia.org/wiki/Top_40
    (Last accessed Aug. 12, 2006.)

1    In addition, StreamCast took active steps to protect illegal file

2  trading from the enforcement efforts of copyright holders.  In May

3  2001, StreamCast became aware of MediaEnforcer, a software program

4  that enabled copyright owners to track infringement on the Internet.

5  As documented in a series of emails, StreamCast immediately undertook

6  action to block MediaEnforcer from the Morpheus network.  (Fabrizio

7  Decl. Ex. 14 at 925-28.)  StreamCast also blocked from its network

8  Plaintiffs' law firm Mitchell Silverberg and the anti-piracy firm

9  NetPD, which StreamCast described in an email as "hackers for RIAA and

10  Metallica."  (Fabrizio Decl. Ex. 14 at 867).  StreamCast also deployed

11  encryption technology so that Plaintiffs could not see what files were

12  being transferred through Morpheus.  (Fabrizio Decl. Ex. 2 at 287-89;

13  Ex. 14 at 1405, 409-12.)  StreamCast's current protestations that it

14  was merely protecting the privacy of its users - as stated in Weiss's

15  affidavit - is belied by these internal documents and deposition

16  testimony showing its concern about copyright enforcement efforts.  As

17  chairman Griffin has explained, "[w]ith the continued litigious nature

18  of the media companies at the time, we were always looking for ways to

19  find a more anonymous solution" for its users.  (Fabrizio Decl. Ex. 1

20  at 120-21.)

21

22    F.    StreamCast's Business Model Depended on Massive Infringing

23          Use

24    In Grokster, the Supreme Court identified StreamCast's reliance

25  on revenue from infringing use as evidence of unlawful intent.  125 S.

26  Ct. at 2781-82.  Until 2004, StreamCast did not sell its Morpheus

27  software, but gave it to away to users without cost.  Revenue was

28  generated by displaying advertising on the software's user interface.

"[T]he more the software is used, the more ads are sent out and the greater the advertising revenue becomes.  Since the extent of the software's use determines the gain to the distributors, the commercial sense of their enterprise turns on high-volume use, which the record shows is infringing."  Id.  In 2001, nearly all of StreamCast's revenue came from advertising.  In 2002, advertising still made up nearly two-thirds of StreamCast's total revenue.  In 2003, advertising's share of total revenue sunk to 19%, but it increased back to 26% in 2004.  As of early 2006, advertising made up about half of total revenue.

StreamCast relies on the drop in advertising's share of total revenue in 2003 and 2004 to argue that a triable issue remains on whether its business model creates an inference of unlawful objective. The argument is unpersuasive.  According to StreamCast, in those two years the bulk of non-advertising revenue consisted of software bundling, a practice in which StreamCast was paid by third party software companies to "bundle" their software with Morpheus for distribution.  Users would receive the bundled third party software along with each download of Morpheus.  For purposes of the inducement doctrine, the business logic of bundling was no different from advertising.  The attractiveness of StreamCast's bundling services to third party software companies depend on the high-volume use of Morpheus.  The more times Morpheus was downloaded, the more bundling business StreamCast stood to gain.  And the evidence is that Morpheus is most often downloaded and used for infringement.  It is true that sales of Morpheus now account for a significant part of StreamCast's business.  However, even then advertising still constitutes about half of StreamCast's revenue.

38

The record shows that StreamCast knew its business model depended on massive infringing use, and acted to grow its business accordingly. Smith has testified that StreamCast's objective in advertising to Napster users was to "increase the number of users by increasing the amount of file-sharing, because the more files that were physically available, the more users would come." (Fabrizio Decl. Ex. 2 239-40.) Shortly after launching the OpenNap/Music City network, Weiss measured the company's progress by tracking the number of files that were available, which he told employees had increased from 316,000 to 15,006,322 MP3 files in less than two weeks. (Fabrizio Decl. Ex. 14 at 768-81.) A month later, art director Schaffer produced presentation slides boasting that OpenNap/MusicCity had more files available for sharing than Napster. (Fabrizio Ex. 14 at 614, 623, 627, 633.) The large number of users who were drawn to StreamCast by the files available for download was an asset for StreamCast's advertising business. For example, StreamCast sales executive Trey Bowles touted StreamCast to a prospective advertiser by pointing out that "Morpheus has such a high media content with almost every user interested in music in many capacities." (Fabrizio Ex. 14 at 528.) Of course, it helped StreamCast's profitability that it did not incur any costs to obtain the content that was used to attract users. As a PowerPoint presentation stated, a strength of its model was "that it had "[n]o product costs to acquire music" and an "[a]bility to get all the music." (Fabrizio Ex. 15 at 1006.)

StreamCast emphasizes that it intended - as documented by business plans and strategy papers - to pay for licensed content, and also to derive revenue from instant messaging and an internet telephone service. StreamCast also blames Plaintiffs for their

difficult licensing terms, which StreamCast believes prevented it from launching a successful, legal business with licensed content. StreamCast has submitted declarations from its executives stating that StreamCast wanted to be a legitimate business, and that infringing users took up its products through no fault of its own.  Whatever its subjective intentions were about eventually securing licenses and developing revenue streams that did not depend on infringement, the business that actually materialized was one that thrived only because of the massive infringement enabled by Morpheus and OpenNap/MusicCity. And as recounted above, undisputed objective evidence shows that StreamCast distributed its software with the goal of facilitating and profiting from infringing use.

### G.   StreamCast Has Taken No Meaningful Affirmative Steps to Prevent Infringement

The Supreme Court held that a defendant's failure to prevent infringing use may indicate an intent to facilitate infringement. Grokster, 125 S. Ct. at 2781.  Although secondary liability may not be premised on this factor alone, it may be considered along with other circumstances in determining the defendant's motive.  Id. at 2781 n.12.  By implication, although StreamCast is not required to prevent all the harm that is facilitated by the technology, it must at least make a good faith attempt to mitigate the massive infringement facilitated by its technology.

Plaintiffs point out, and StreamCast does not dispute, that StreamCast has never implemented a system to filter out copyrighted content from the Morpheus network.  However, the parties vigorously dispute whether filtering is technologically feasible.  Generally, two

potential methods of filtering exist.  The first is based on acoustic fingerprinting technology, which involves the creation of unique digital signatures for each music file and the identification of the files on the basis of that signature through comparison of a database of copyrighted content.  The file-sharing client application would then be programmed to block files that match the signatures of known copyrighted content.  Plaintiffs have submitted declarations from executives of acoustic fingerprinting technology companies to show that acoustic fingerprinting is a readily available solution for stopping rampant copyright infringement in file-sharing networks.  StreamCast rejoins that acoustic finger-printing does not work.  A StreamCast witness' affidavit states that he was able to find copy-righted content made available for sharing on the iMesh network, a StreamCast competitor, inspite of iMesh's implementation of acoustic fingerprinting-based filtering.  StreamCast has requested further discovery pursuant to Rule 56(f) to evaluate the effectiveness of acoustic fingerprinting technology.

The second potential filtering method is based on metadata.  Metadata is data that describes the properties of a digital file.  A music file typically has such metadata as song title and artist name.  Morpheus itself executes file searches on the basis of metadata, such as song names.  Conversely, the search function could be programmed to filter out copyrighted files on the basis of metadata.  FastTrack-based versions of Morpheus already contain a feature that, if activated by the user, filters out pornographic content on the basis of file name.  Plaintiffs argue that the technology behind the pornography filter could easily be reconfigured to filter out copyrighted content.  For example, the client software could be

configured to filter out all files bearing the names "Jay-Z" or "the
Beatles."  StreamCast counters that metadata filtering would be
burdensome and overbroad, as it would block all files that share
common words in metadata, even if the file is not copyrighted.  There
is less concern with overinclusive filtering for pornography because
there are only a few terms commonly associated with pornography; in
contrast, a list that contains of all copyrighted music and movies
owned by Plaintiffs would contain many generic terms, with
correspondingly greater potential for overinclusive filtering.
StreamCast also argues that, with regard to FastTrack-based versions
of Morpheus, StreamCast did not have the ability to directly modify
the FastTrack source code, which the licensor controlled,  to
implement copyright filtering.  StreamCast also emphasizes that former
chief technology officer Smith, who is now cooperating with
Plaintiffs, has given inconsistent testimony on the feasibility and
ease of filtering technology; his current testimony is far more
optimistic about the feasibility of metadata filtering than when he
was still employed by StreamCast.

Based on the foregoing, a jury could reasonably agree with
StreamCast that copyright-filtering does not work perfectly, and
implementing it would negatively impact usability.  However, the
ultimate question for this Court's inquiry is to examine StreamCast's
intent.  Even if filtering technology does not work perfectly and
contains negative side effects on usability, the fact that a defendant
fails to make some effort to mitigate abusive use of its technology
may still support an inference of intent to encourage infringement.

However, the technological issue is beside the point, considering
StreamCast's expressed attitude toward filtering.  In the record,

42

there is no hint that StreamCast was at all troubled by the fact that its products were used to commit copyright infringement on a massive scale.  While StreamCast executives were quick to express concern and devise technological solutions to prevent Plaintiffs from enforcing their copyrights, they were positively resistant to the possibility of copyright filtering.  That is not surprising, because StreamCast's business depended on attracting users by providing them with the ability to pirate copyrighted content.  As Weiss stated, "[w]e did not care what was on those files [traded by the users], we only cared that we were able to compare ourselves favorably with the much larger and firmly entrenched Napster."  (Weiss Decl. at 52.)

According to Smith's undisputed testimony, he had discussed the possibility of metadata-based copyright filtering on OpenNap/MusicCity and FastTrack/Morpheus, but Kallman and Weiss both rejected the idea.

> Q:    What was [Weiss's]  reaction to your copyright filtering schemes?
>
> A:    He thought it was a great idea in the context of using it for cross-promotional advertising based upon what users were searching for, not for blocking the file from being - but not for the purpose of blocking the file so the person couldn't access it.
>
> Q:    So it was a good idea for the purpose of knowing what they were trading but not for the purpose of stopping trading them from trading copyrighted works?
>
> A:    That's correct.
>
> :   :   :
>
> A:    It was a phone conversation where we were basically talking about being able to do things like, let's say someone was

searching for a Christina Aguilera song, and at the same time there was additional information that would pop up next to that search result coming from Amazon or from another location. Because at the time Kazaa, they were doing that, and that was a feature that we weren't taking advantage of. And during our conversations of talking about being able to filter, they didn't like the idea of that being implemented in the software, because if we were told to turn that on, there was basically fear it could . . . shut down the number of users.

(Fabrizio Decl. Ex. 2 at 265-66.)  In fact, StreamCast saw its resistance to filtering as a competitive advantage.  In another conversation, Griffin and Weiss discussed the possibility that Napster might be judicially ordered to implement copyright filters.  As Griffin recalled in deposition:

Q:   And if Napster was forced to filter its files to eliminate copyrighted popular music, do you remember Mr. Weiss saying what the likely impact on the Napster users would be?

A:   I don't remember his exact words, but I recall the tenor of the conversation was that we will take all their users.

(Fabrizio Decl. Ex. 1 at 103.)

Not surprisingly, StreamCast was unreceptive when it was approached in 2002 by GraceNote, a company that had worked with Napster on a way to use acoustic fingerprinting technology to identify copyrighted music and pay copyright holders.  Jody Pace, the StreamCast employee responsible for responding to GraceNote's offer emailed Trey Bowles for instructions: "I know this is something we DO NOT want to do, but I am not sure how I need to word that." (Fabrizio

Ex. 14 at 957.)   Indeed, Smith, who as chief technology officer would be involved in any major technical decision, testified in 2002 that he has never conducted major research into the viability of new acoustic fingerprinting technology.   Nor had he ever been asked to investigate the availability of databases that might be used for filtering. (Baker Decl. Ex. 15 at 3497-3503.)

This Court recognizes that StreamCast blocked certain users from its network when asked to do so by copyright holders.   However, its effort was half-hearted at best.   As described above, StreamCast used encryption technology to defeat Plainitffs' monitoring efforts. Morever, blocking users was not very effective because a user could simply create a new username to re-enter the network under a different identity.   StreamCast had the capability of automatically blocking these users on a rolling basis, but expressly decided not to do so. (See, e.g., Smith Depo. at 153-54, 157-58, 176-77.)

H.   StreamCast Cannot Reasonably Claim Ignorance of Infringement

StreamCast contends that it was unaware of the copyrights at issue until November 2001, when it was served in the instant action. StreamCast further argues that any evidence of its intent prior to November 2001 - such as internal documents surrounding the launch of OpenNap/MusicCity in January 2001 - cannot be used to prove its intent to induce infringement, simply because it could not logically intend to infringe copyrights of which it was not aware.

This argument is implausible.   StreamCast cannot seriously argue that it did not know that the popular music and movies traded on its network were copyrighted, particularly in light of the publicity surrounding the Napster litigation and StreamCast's clear plans to

45

exploit Napster's legal troubles. StreamCast relies on a series of patent cases - see, e.g., L.A. Gear, Inc. v. E.S. Originals, Inc., 859 F. Supp. 1294, 1300 (C.D. Cal. 1994) - for the proposition that a defendant cannot be found to have intended and encouraged patent infringement unless it was actually aware of the infringed patent. However, while whether a particular technical process is patented may not be immediately obvious, it is common knowledge that most popular music and movies are copyrighted.


   I.    Summary of Inducement Liability

       In sum, evidence of StreamCast's objective of promoting infringement is overwhelming. Indeed, in Grokster the Supreme Court had hinted that summary judgment should be granted for Plaintiffs after reviewing much of the same evidence. 125 S. Ct. at 2782. After carefully and independently considering the evidence presented by the parties, the this Court finds that no reasonable factfinder can conclude that StreamCast provided OpenNap services and distributed Morpheus without the intent to induce infringement. The only remaining question is whether StreamCast can show that a continuance of this summary judgment motion is warranted.


VI.   The Rule 56(f) Motion

   A.    Legal Standard

       Federal Rule of Civil Procedure 56(f) allows the Court to refuse an application for summary judgment or order a continuance if the party opposing the motion cannot present "facts essential to justify

the party's position."[15]   "To prevail under this Rule, parties opposing a motion for summary judgment must make '(a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists.'"   Employers Teamsters Local No. 175 v. Clorox Co., 353 F.3d 1125, 1129 (9th Cir. 2004) (internal citation omitted).   "'The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment.'"   Id. at 1129-30 (quoting Chance v. Pac-Tel Teletrac, Inc., 242 F.3d 1151, 1161 n.6 (9th Cir. 2001)).   "'The district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past, or if the movant fails to show how the information sought would preclude summary judgment.'"   Id. at 1130 (quoting Cal. Union Ins. Co. v. Am. Diversified Sav. Bank, 914 F.2d 1271, 1278 (9th Cir. 1990) (internal citations omitted)).

StreamCast has requested further discovery on four issues: (1) the feasibility of acoustic fingerprinting technology; (2) the reliability of statistical methods devised by Plaintiffs' expert Dr. Olkin; (3) the credibility of witness Smith, its former chief technology officer who is now cooperating with Plaintiffs; and (4) the issue of the copyright misuse defense.

---

[15]   Rule 56(f) provides:
Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
Fed. R. Civ. P. 56(f).

### B.   The Deposition Requests

StreamCast wants to depose Plaintiffs' witnesses who submitted affidavits on the effectiveness of acoustic fingerprinting technology. StreamCast intends to demonstrate that acoustic fingerprinting technology cannot be effectively deployed in a peer-to-peer file-sharing network.  However, the ultimate issue centers on StreamCast's intent.  Technical feasibility is immaterial in light of clear evidence that StreamCast was resistant to the idea of copyright filtering for fear that it would drive away infringing use, on whom StreamCast' business depended.

StreamCast's desire to depose Dr. Olkin, who designed the statistical study on the amount of infringing material on the Moprheus network, is likewise unavailing.  Dr. Olkin has explained his methodology in detail in his affidavit.  StreamCast has offered no specific objection to his methodology, but merely alleges a general belief that his methods are biased.  "Neither a desire to cross-examine affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment, unless other evidence about an affiant's credibility raises a genuine issue of material fact."  Frederick S. Wyle, P.C. v. Texaco, Inc., 764 F.2d 604, 608 (9th Cir. 1985).

StreamCast questions Smith's credibility on the ground that he is cooperating with Plaintiffs to avoid personal liability, and seeks an opportunity to further depose him.  StreamCast has already deposed him several times in the past, including twice after he left StreamCast. StreamCast contends that it was not aware of Smith's cooperation with Plaintiffs when it last deposed him.  It is true that Smith's latest

deposition testimony on the technical feasibility of metadata filtering is arguably inconsistent with the deposition testimony he gave earlier while he was still in StreamCast's employment.[16] However, that is the only issue on which any arguable inconsistency exists, and one that is not critical to the Court's decision.   The parts of Smith's deposition testimony that have been relied on by the Court - such as his recollection of statements by Weiss - are generally corroborated by other independent evidence.   Moreover, since the case focuses on StreamCast's motive and intent, most of the relevant facts are squarely within StreamCast's control, and nothing stops StreamCast from producing evidence to contradict Smith's testimony.

Thus, StreamCast's request for further depositions is denied.


### C.   Copyright Misuse

Finally, StreamCast contends that a ruling on summary judgment should be deferred so it can conduct discovery on its copyright misuse affirmative defense.   At the outset, the Court notes that StreamCast has offered no reasonable excuse for its failure to propound discovery on affirmative defenses before the discovery cutoff of March 7, 2005. StreamCast had pleaded its affirmative defenses in the answer it filed in December 2001.[17]   Although the Court granted summary judgment for

---

[16]   Smith's answers while he was employed by StreamCast were generally more vague, so the Court has found no direct contradictions on any point between his various deposition testimonies.   But StreamCast is right that the general tenor of the testimony has been inconsistent over time, and is now much less favorable to StreamCast.

[17]   StreamCast's answer did not specifically plead copyright misuse, but it did plead unclean hands, which StreamCast now claims preserved the misuse defense.   (StreamCast Brief 7/26/2006 at 16.)

StreamCast in April 2003 for the then-current version of StreamCast's software, StreamCast remained potentially liable for past versions of its services, including the OpenNap service that was modeled on Napster.

Considering that the Ninth Circuit had already upheld a preliminary injunction against Napster at that time, A & M Records, 239 F.3d at 1029, StreamCast should have diligently pursued discovery on its affirmative defenses even as this case proceeded through appeal.  The only explanation StreamCast has offered is that it had been focused on the liability issue - a non-explanation.  Moreover, contrary to StreamCast's contention, the Court's stay of discovery on Defendant Sharman's antitrust counterclaims, imposed in February 2004, did not prevent StreamCast from taking discovery on its affirmative defenses.  The instant case commenced nearly five years ago. StreamCast's failure to diligently pursue discovery is sufficient ground to deny its request for a continuance.  Clorox, 353 F.3d at 1130.  Nonetheless, as a separate ground for denying a continuance, the Court will address StreamCast's substantive misuse allegations.

Generally, the misuse defense prevents a copyright holder that has misused its copyright from enforcing the copyright in a court of equity.  See Lasercomb Am., Inc. v. Reynolds, 911 F.2d 970, 978 (4th Cir. 1990).  The misuse doctrine, which is derived from the well-established defense of patent misuse, is a relatively recent development in copyright law.  Id. at 975-77.  Indeed, "[t]the legitimacy of copyright misuse as a valid defense to an infringement action was in question for some time." In re Napster, Inc. Copyright Litigation, 191 F. Supp. 2d 1087, 1102 (N.D. Cal. 2002).  Lasercomb was the first court of appeals decision to embrace the defense.  911

F.2d at 978.  The Ninth Circuit adopted LaserComb's reasoning and expressly recognized the defense in Practice Mgmt. Info. Corp. v. American Med. Assoc., 121 F.3d 516 (9th Cir. 1997).  "Copyright misuse does not invalidate a copyright, but precludes its enforcement during the period of misuse."  Id. at 520 n.9; see also Lasercomb, 911 F.2d at 979 (reversing trial court's injunction and award of damages because "[the plaintiff] should have been barred by the defense of copyright misuse from suing for infringement of its copyright.")  The bar against enforcement is effective only during the period of misuse.  The plaintiff is free to bring suit to enforce its rights against infringers once the misuse ceases.  Lasercomb, 911 F.2d at 979 n.22.  "The doctrine does not prevent plaintiffs from ultimately recovering for acts of infringement that occur during the period of misuse."  In re Napster, 191 F. Supp. 2d at 1108; see also Arista Records, Inc. v. Flea World, Inc., 356 F. Supp. 2d 411, (D.N.J. 2005) ("[O]nce the purported misuse ceases, no impediment to enforcement of the 'misused' copyright remains.").

The threshold question is what conduct by the copyright holder suffices to trigger the misuse defense.  StreamCast contends that any use of copyright in violation of public policy is sufficient.  That position is both contrary to established precedents and the logic of the misuse defense.  As Lasercomb explained, the misuse inquiry focuses on "whether the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright."  911 F.2d at 978 (emphasis added).  "Misuse often exists where the patent or copyright holder has engaged in some form of anti-competitive behavior."  Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc., 342 F.3d 191, 204 (3d Cir. 2003); see also Practice Management,

121 F.3d at 520 ("[D]efense of copyright misuse 'forbids the use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office.'") (quoting Lasercomb, 911 F.2d at 977).   "More on point, however, is the underlying policy rationale for the misuse doctrine set out in the Constitution's Copyright and Patent Clause: 'to promote the Progress of Science and useful Arts.'"   Video Pipeline, 342 F.3d at 204 (quoting U.S. Const. art. I, § 8, cl. 8).   Thus, the misuse defense applies only if a copyright is leveraged to undermine the Constitution's goal of promoting invention and creative expression.   There has to be a sufficient nexus between the alleged anti-competitive leveraging and the policy of the copyright laws.   See In re Napster, 191 F. Supp. 2d at 1108 (a party asserting misuse on the basis of an antitrust violation must establish a "nexus between . . . [the] alleged anti-competitive actions and [the plaintiff's] power over the copyrighted material.") (internal citations and quotation marks omitted).

Lasercomb, and the three other court of appeals decisions that followed its reasoning, all involved restraints on inventive or creative activity.   In Lasercomb, the plaintiff, the vendor of an industrial die-making software program called Interact, sued for copyright infringement after a licensee copied and sold copies of Interact without authorization.   The plaintiff's standard licensing agreement forbade licensees and their employees from writing, developing, or selling computer-assisted die-making software for ninety-nine years.   Lasercomb, 911 F.2d at 972-73.   The Fourth Circuit held that restrictive license constituted misuse of copyright, and barred the plaintiff from prevailing on its copyright infringement claims.   The court explained:

> The language employed in the Lasercomb agreement is extremely broad. Each time Lasercomb sells its Interact program to a company and obtains that company's agreement to the noncompete language, the company is required to forego utilization of the creative abilities of all of its officers, directors and employees in the area of CAD/CAM die-making software. Of yet greater concern, these creative abilities are withdrawn from the public.

Id. at 978. Accordingly, "[t]he misuse arises from Lasercomb's attempt to use its copyright in a particular expression, the Interact software, to control competition in an area outside the copyright, i.e., the idea of computer-assisted die manufacture, regardless of whether such conduct amounts to an antitrust violation." Id. at 979 (second emphasis added).

In DSC Communications Corp. v. DGI Technologies, Inc., 81 F.3d 597, 600-01 (5th Cir. 1996), the Fifth Circuit agreed with Lasercomb that the misuse defense applies when a copyright holder attempts to leverage its legal monopoly over a particular expression into patent-like powers over a general idea. See also Mazer v. Stein, 347 U.S. 201, 217 (1954) ("Unlike a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea - not an idea itself."), superseded by statute, Falonica, Inc. v. El Dorado Corp., 697 F.2d 890 (9th Cir. 1983) DSC involved telephone switching systems that included component microprocessor cards. 81 F.3d at 600-01. The entire system was controlled by copyrighted software, and a microprocessor card could function in the system only if a copy of the software is downloaded to the card. The plaintiff manufactured both the switches and the software; the

53

software was licensed to customers on the condition that they run the software only on switches made by the plaintiff.  In upholding the denial of the plaintiff's request for a preliminary injunction against a manufacturer of microprocessor cards, the Fifth Circuit noted the restrictive license's effect on competition in ideas:

> [The defendant] may well prevail on the defense of copyright
> misuse, because DSC seems to be attempting to use its
> copyright to obtain a patent-like monopoly over unpatented
> microprocessor cards.  Any competing microprocessor card
> developed for use on DSC phone switches must be compatible
> with DSC's copyrighted operating system software.  In order
> to ensure that its card is compatible, a competitor such as
> [the defendant] must test the card on a DSC phone switch.
> Such a test necessarily involves making a copy of DSC's
> copyright system, which is downloaded into the card's memory
> when the card is booted up.  If DSC is allowed to prevent
> such copying, then it can prevent anyone from developing a
> competing microprocessor card, even though it has not
> patented the card. . . . Therefore,[the defendant's]
> asserting the misuse defense could cast substantial doubt on
> the predictability of success by DSC.

Id. at 601.

A restrictive licensing provision was also the basis for the Ninth Circuit's application of the misuse defense in Practice Mangement.  The case involved a medical coding system that was licensed on the condition that the licensee refrain from using any other competing coding system.  The Ninth Circuit held that the licensing terms violated the public policy embodied in the grant of a

1  copyright, because the terms "gave the [defendant] a substantial and
2  unfair advantage over its competitors." Practice Mgmt., 121 F.3d at
3  521.
4      Lastly, in Video Pipeline, the Third Circuit concurred that
5  creativity-restricting licensing agreements may violate the public
6  policy behind the copyright laws. 342 F.3d at 204-05. "Anti-
7  competitive licensing agreements may conflict with the purpose behind
8  a copyright's protection by depriving the public of the would-be
9  competitor's creativity." Id. at 205. Nonetheless, the court
10 declined to apply the misuse defense to the licensing agreement it
11 confronted. The expressions at issue were Disney movie trailers
12 licensed for display on Internet sites, on the condition that the
13 sites on which the trailers appear do not criticize Disney or the
14 entertainment industry. Id. at 206. The court ruled that the
15 restriction did not "interfere with creative expression to such a
16 degree that they affect in any significant way the policy interest in
17 increasing the store of creative activity," because nothing prevented
18 licensees or the public in general from criticizing Disney else where,
19 including web sites that do not display Disney movie trailers. Id.
20     In sum, the existing case law teaches that the misuse defense
21 applies when a copyright holder leverages its copyright to restrain
22 creative activity. In the instant case, StreamCast advances a litany
23 of vague allegations of anticompetitive conduct on the part of
24 Plaintiffs. None of the alleged misconduct has sufficient nexus with
25 the public policy embodied in the grant of a copyright to implicate
26 the misuse defense.
27     StreamCast primarily alleges that Plaintiffs have restrained
28 competition in the market for digital distribution of music and movies

by collectively refusing to deal with StreamCast and other file-sharing services.  Rather than granting distribution license to StreamCast on reasonable terms, StreamCast alleges, Plaintiffs have colluded to license only to certain selected distributors, such as Apple Computer, which has not been accused of facilitating massive copyright infringement.  StreamCast relies heavily on In re Napster, which granted the defendant Napster's Rule 56(f) motion to permit further discovery on the copyright misuse defense.  The case involved copyright infringement claims brought by many of the same plaintiffs as those now before this Court.  There, Napster alleged a number of anti-competitive practices by the major music companies to restrain competition in the market for online digital music distribution, including concerted refusal to deal, vertical foreclosure of the digital distribution market through concerted price squeezes on retailers, and joint ventures like MusicNet that facilitate price coordination.  In re Napster, 191 F. Supp. 2d at 1108-09.  The court ruled that further discovery was warranted because "[t]hese joint ventures bear the indicia of entities designed to allow plaintiffs to use their copyrights and extensive market-power to dominate the market for digital music distribution."  Id. at 1109.

StreamCast's argument is unpersuasive.  Concerted boycotts may violate the antitrust laws, but the existence of an antitrust violation is a separate question from the applicability of the copyright misuse defense.  Even if Plaintiffs did act in concert to refuse licenses to StreamCast and restrict competition in the market for digital media distribution, that would not have extended Plaintiffs' copyrights into ideas or expressions over which they have no legal monopoly.  Reproduction and distribution of copyrighted works

1    are "exclusive rights of copyright holders." A&M Records, 239 F.3d at

2    1027.  The right to exclude is inherent in the grant of a copyright; a

3    copyright is not improperly expanded simply because the owner has

4    exercised his or her power to exclude.  Moreover, there is no reason

5    to think that musicians and filmmakers will be prevented from engaging

6    in creative activity because Plaintiffs refused to grant a

7    distribution license to StreamCast.  The alleged boycotts would not

8    have "deprived the public of the would-be competitor's creativity,"

9    Video Pipeline, 342 F.3d at 204, or leveraged Plaintiffs' copyrights

10   "to restrain the creative expression of another."  Id. at 205.  Of

11   course, concerted boycotts may constitute serious antitrust

12   violations; StreamCast may recover treble damages if it so proves in

13   an antitrust action.  However, in the absence of a nexus between the

14   antitrust violation and the copyright laws' policy of promoting

15   creative activity, StreamCast's remedy lies in antitrust rather than

16   copyright.  To the extent this holding is inconsistent with In re

17   Napster, the Court declines to follow that precedent.

18        StreamCast further alleges that the record company Plaintiffs

19   engaged in retail and wholesale price-fixing with respect to both

20   compact discs and online media distribution.  In addition to harming

21   consumers, the music companies also damaged retail distributors by

22   forcing them to overpay for distribution licenses.  Just like the

23   alleged boycotts, these price-fixing allegations do not implicate the

24   policy concerns that motivate the misuse doctrine.  Price-fixing, in

25   and of itself, does not restrict competitors or the public from

26   engaging in creative activity.  Nor does it extend Plaintiffs'

27   copyrights into non-copyrighted ideas and expressions.  Indeed,

28   collusive pricing is not "connected to any copyrighted work, but [is]

merely conduct in which the providers of any good or service,
copyrighted or not, could engage." Arista Records, Inc., 356 F. Supp.
2d at 430 (denying misuse defense predicated on price fixing
allegations in the compact disc market).  That price-fixing violates
the antitrust laws is not, without more, sufficient to trigger the
misuse defense.

Lastly, StreamCast argues that the music publisher Plaintiffs
have abused their copyrights by demanding mechanical royalties for
music streaming over the Internet.  Under 17 U.S.C. § 115, anyone who
makes or distributes a phonorecord of a music composition must obtain
a license from the copyright holder.  That right to distribute a
phonorecord is known as a mechanical license.  Streaming, in turn,
refers to on-demand music performances over the Internet.  In a
streaming performance, the user is not provided with a permanent
digital copy of the streamed music, and instead accesses copies
residing on the provider's server computers.  Various segments of the
music industry vigorously dispute whether streaming requires just a
license for public performance, or whether both performance and
mechanical license are needed.  According to StreamCast, the music
publisher Plaintiffs have refused to grant licenses for conventional
music downloads, which are uncontroversially subject to mechanical
licenses, unless licensees also agree to pay royalties for streaming.
In StreamCast's view, such aggressive licensing tactics amount to
"double-dipping," an att empt to extend the publishers' monopoly
rights over  phonorecords into the area of public music performances.

However, music publishers asserting their mechanical rights have
prevailed in at least one infringement action against a streaming
service provider.  See The Rodgers and Hammerstin Organization v. UMG

Recordings, Inc., 2001 WL 1135811 (S.D.N.Y. Sept. 26, 2001). Thus, even if the music publishers aggressively demanded royalties for streaming, they were merely enforcing their copyrights. A plaintiff's "enforcement of its copyrights does not constitute copyright misuse." Advanced Computer Services of Michigan, Inc. v. MAI Systems Corp., 845 F. Supp. 356, 370 (E.D. Va. 1994).

StreamCast points to testimony before Congress by Jonathan Potter, a representative of royalty-paying digital music distributors, and Marybeth Peters, the Registrar of Copyright. Both disputed the music publishers' position that mechanical licenses are required for streaming. Nevertheless, Potter referred to "ambiguities" in section 115 with regard to mechanical rights for streaming, and Peter declined to characterize demanding both mechanical and performance royalties as "double-dipping." (Young Decl. Ex. 4 at 29; Peters Testimony at 7.) The Court need not now decide whether mechanical licenses are required for streaming. But the Court rejects StreamCast's position that a copyright holder's assertion of what it plausibly believes to be its rights under an ambiguous statute can constitute copyright misuse. A contrary result would turn the copyright law on its head.

StreamCast's misuse allegations, even if proven, are insufficient to defeat summary judgment as a matter of law. Further discovery under Rule 56(f) is not warranted.

///
///
///

**VII. CONCLUSION**

For the foregoing reasons, this Court GRANTS Plaintiffs' motion for summary judgment as to StreamCast's liability for inducing copyright infringement through MusicCity/OpenNap and Morpheus.  This Court DENIES StreamCast's Rule 56(f) motion for a continuance.

IT IS SO ORDERED.

DATED: _____9/27/06_____

_____
STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

60